JOHN SALMEN, Plaintiff-Appellee, v. CONSTANCE KAMBEROS, Defendant-Appellant.

First District (6th Division)   No. 1—89—0634

Opinion filed September 28, 1990.—Rehearing denied November 13, 1990.

Nisen & Elliott, of Chicago (Michael H. Moirano and Christopher P. Koback, of counsel), for appellant.

Komessar & Wintroub, of Chicago (Cary J. Wintroub, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, John Salmen (Salmen), filed an amended two-count complaint for malicious prosecution against the defendant, Constance Kamberos (Kamberos), alleging that she had caused a criminal complaint to be filed against the plaintiff on March 24, 1981, and another criminal complaint to be filed against the plaintiff on June 30, 1981, that he was acquitted on both charges and that the defendant had brought the charges knowing that they were unjustified and lacked probable cause.

The defendant filed a counterclaim alleging in one count that the plaintiff had assaulted her on March 23, 1981, in another count that he had committed a battery against her on June 15, 1981, and in another for malicious prosecution of the defendant by the plaintiff's filing a disorderly conduct charge against her on June 16, 1981, a charge which was dismissed for want of prosecution.

The jury returned a verdict for the plaintiff on both counts of his complaint; it fixed $3,000 compensatory damages and $5,000 punitive damages on count I; on count II it fixed $2,816 for compensatory damages and $5,000 for punitive damages. It also entered a verdict for the plaintiff and against the defendant on all counts of her counterclaim.

The defendant seeks reversal of the money judgments in favor of the plaintiff, contending that the verdicts are against the manifest weight of the evidence; alternatively, she seeks a new trial on the grounds that the judge erred in restricting the testimony of her attor-

ney and that the plaintiff's attorney's conduct was prejudicial and denied her a fair trial.

In 1974 the plaintiff became employed as the head janitor in the apartment building where the defendant had lived since 1959. When the building was converted to condominiums in 1979, the defendant, who is a lawyer, purchased a unit in the building; the plaintiff remained as head janitor after the conversion.

At 2:15 p.m. on March 23, 1981, an altercation occurred between the parties. Kamberos testified as an adverse witness that, as she stood near the freight elevators on the ground floor in the rear lobby of the building, two doors leading from the alley opened and the defendant saw Salmen "almost running" toward her with his fist over his head, yelling and calling her names. He came within two feet of her and said, "I am going to kill you"; he called her a "swinehundt [sic]" and a "goddamn bitch." Kamberos screamed for help and heard another door open. Phil Pecoraro, an assistant janitor in the building, entered the lobby, grabbed Salmen by the shoulders and pulled him toward the boiler room; after Pecoraro and Salmen left, Kamberos went up to her apartment. That night she talked with her attorney and then went to the police station. Later, she and two police officers met with Salmen, and she asked Salmen for his key to her apartment; he refused to give her the key. The officers told her she would have to file suit to recover the key.

Salmen and Pecoraro both testified that they entered the rear lobby together and saw Kamberos standing inside with a piece of paper and a pen or pencil; she looked at her watch and wrote something. Kamberos asked where Salmen had been, and he indicated that it was none of her business and that she was not his boss. Then, as Salmen and Pecoraro walked into the boiler room, Kamberos screamed at them, calling Salmen a "goddamn Hitler Nazi." Salmen and Pecoraro went into the boiler room and closed the door. Salmen was never closer than 10 feet to Kamberos, and he denied ever yelling or waving his fist at Kamberos.

The next day Kamberos went to the police station and swore out a complaint for assault against the defendant. On April 15, 1981, Salmen appeared in criminal court on the assault complaint. Kamberos testified against him, and Salmen and Pecoraro testified in Salmen's defense. The judge found Salmen not guilty.

In the afternoon of June 15, 1981, another incident between the parties occurred. Kamberos testified that, at approximately 4 p.m., she and a man named Fontanini entered the rear lobby through the double doors; she asked Fontanini to wait, and she headed to the

front lobby to get her mail from her mailbox. As she passed the boiler room door in the rear lobby, Salmen opened the door, struck her right shoulder with his fist and told her to get out of the way. Salmen then returned to the boiler room and closed the door immediately. Kamberos proceeded to the mail room where she saw, but did not talk to, the plaintiff's wife, Anna Salmen. Sometime in the week following these events, Kamberos again talked with her attorney, who advised her to sign a criminal complaint for battery against the defendant. Kamberos signed the complaint, and in September 1981, Salmen was again found not guilty of battery after a bench trial.

Salmen testified that on June 15 at approximately 3:30 p.m. he was working in the boiler room when Pecoraro told him that Kamberos was in the front lobby arguing with another janitor, Willie Wagner. Salmen went to the lobby and told her to leave his janitors alone, and she headed toward the mailboxes. The three janitors then heard yelling coming from the mailbox location and went to investigate. They found Kamberos screaming at Anna Salmen, calling her "fat slob" and "pig." Salmen told Kamberos to leave his wife alone and told Pecoraro to call the police. Kamberos left, and when the police came, they told Salmen to sign a complaint against Kamberos, which he did the following day. A hearing on Salmen's complaint was scheduled on June 21, 1981, but Salmen did not appear in court, and the complaint was dismissed. On July 10, 1981, Salmen was arrested on the second complaint signed by Kamberos on June 30. Salmen was handcuffed, taken to the police station, fingerprinted and charged with battery. As previously noted, he was found not guilty after a bench trial.

Pecoraro testified that on June 15, 1981, he and Wagner were shampooing the carpet in front of the building when Kamberos approached Wagner and said, "Your father working [sic] here and we got to support your drunken father, all your family." At that point Pecoraro went to get Salmen. He and Salmen returned to the front lobby 30 seconds later. After Salmen told Kamberos to leave his men alone, Kamberos began screaming at Salmen. Kamberos then went to the mailboxes and began screaming at Salmen's wife. Salmen told Pecoraro to call the police, and Pecoraro did so. Pecoraro testified that Salmen never struck Kamberos.

Willie Wagner testified that on June 15, 1981, while he was shampooing the carpet in the front lobby, Kamberos yelled at him. When Salmen arrived in the front lobby, Kamberos began screaming at Salmen and his wife. Wagner was the son of plaintiff's cousin and was subsequently discharged "for drunkenness."

Darlene Duncan, the site property manager of the building, testified that during early 1981 Kamberos made explicit critical comments about the quality of Salmen's work. Linda Nowak, another unit owner, testified that she attended board of directors' meetings and that Kamberos was the only person that brought complaints about Salmen to the board. Anna Salmen, the plaintiff's wife, testified in substance the same as Pecoraro and Wagner.

Sid Woods was a member of the board of directors for the building. In June and July of 1981 he received a series of letters from the defendant, parts of which contained complaints about the plaintiff. The board of directors voted at the July 16, 1981, meeting to pay the plaintiff's legal fees for defense of the criminal battery charge brought by the defendant. The money for the plaintiff's legal fees came from the condominium association, which is made up of the unit owners. The defendant was a unit owner, the plaintiff was not. Woods also testified in rebuttal that he was acquainted with the defendant's reputation in the community and among her neighbors and other people for truthfulness; her reputation was that she was untruthful.

Kamberos testified that after the plaintiff struck her on June 15, 1981, she was angered, afraid, frustrated and offended that the plaintiff had struck her. On June 18, 1981, she wrote a three-page letter to Ernest Katz, president of the property management company; the letter was copied to the board of directors of the building and complained about the plaintiff not doing his job in other matters. In that letter she never mentioned that Salmen had struck her three days earlier. She wrote two other letters to the board of directors in July of 1981, both of which contained complaints about the plaintiff, but neither mentioned that he had struck her.

Erica Salmen is the plaintiff's daughter and was 10 years old in 1981. She testified that on or about March 25, 1981, and for two to three weeks thereafter, Kamberos told her several times on Erica's way home from school that the defendant would put her father in jail. She said that if somebody else was present Kamberos said nothing and would just walk by her. Kamberos testified that she did not know Erica.

The defendant testified in her own behalf and said that Pecoraro lied in the entire testimony he gave at the plaintiff's criminal trial for assault and that he was a perjurer. She also told the jury that as of the time of trial in this case she was still afraid that the plaintiff would murder her. Before the trial, which took place in 1988, she had not seen the plaintiff since 1982. She testified that she was so afraid that the plaintiff was going to kill her that she told Kromelow right

after the March 23, 1981, incident that the plaintiff had threatened to kill her.

Theodore Kromelow managed and partially owned the building at the time of the occurrences in issue but did not own or manage it at the time of trial. He knew both the plaintiff and the defendant. Salmen had worked for Kromelow as the head janitor. Kromelow testified that at no time after March 23, 1981, did the defendant tell him that she was afraid of the plaintiff or that the plaintiff had assaulted and threatened her.

■■ We do not agree with the defendant's first claim that the findings in favor of the plaintiff are against the manifest weight of the evidence. This case presents a simple question of credibility. The defendant's entire argument is based on the assumption that she was telling the truth. That is an assumption that we cannot accept. Whether the defendant had probable cause to bring criminal charges against the plaintiff was a question of fact for the jury. (*Mack v. First Security Bank* (1987), 158 Ill. App. 3d 497, 511 N.E.2d 714.) It is inescapable that the jury chose not to believe the defendant. We judge that the jury's determination is not against the manifest weight of the evidence.

■■ ■ The defendant's next claim is that the evidence failed to establish malice as a matter of law. Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice. (*Mack*, 158 Ill. App. 3d at 501, 511 N.E.2d at 714.) Lack of probable cause does not itself establish malice, but the trier of fact may infer malice from lack of probable cause if there is no other credible evidence which refutes that inference. (*Frye v. O'Neill* (1988), 166 Ill. App. 3d 963, 977, 520 N.E.2d 1233, 1241-42, quoting *Harpham v. Whitney* (1875), 77 Ill. 32.) We judge that the jury's determination that Kamberos acted without probable cause justified its inference that she acted with malice under the circumstances present here. In sum, we conclude that the jury's findings of lack of probable cause and malice are not against the manifest weight of the evidence.

The defendant next maintains that the judge committed reversible error by preventing her from introducing evidence of the conversation she had with her lawyer before she signed the criminal complaints against the plaintiff.

After the defendant had testified for the second time, the plaintiff's attorney made an oral motion *in limine* seeking to prevent the defendant's attorney from testifying. The judge ruled that the attorney could testify but limited the testimony to the fact that the attorney was consulted by the defendant and that afterward she went to

the police station. The judge stated that "[the attorney's] opinion as to whether or not there was probable cause *** is really irrelevant because his advice would be predicated on what she told him." After the judge's ruling the defendant's attorney asked, "So you will not allow him to testify as to what his recommendations were?" The judge answered that he would not allow him to so testify.

The defendant's attorney was asked whether he had conversations with the defendant after the March 23 and July 15 incidents and what he advised her. In regard to both dates, he testified that he did have a conversation with her and that he subsequently advised her to file a complaint with the police. Therefore, it is clear that the defendant was able to establish what her attorney's recommendation was, and it is also clear that the proof elicited violated the judge's order on the motion *in limine*. The plaintiff's attorney made no objection to the testimony that the plaintiff's attorney recommended that she sign criminal complaints. When the defendant's attorney sought to bring out what the defendant told the attorney and what he told her, the judge sustained the plaintiff's attorney's objection. The issue becomes whether the testimony that the attorney spoke to the defendant and after speaking to her recommended that she sign a complaint is sufficient. We conclude that it was not.

■ Reliance on the advice of an attorney is a defense to a claim of malicious prosecution. (*Pratt v. Kilborn Motors, Inc.* (1977), 48 Ill. App. 3d 932, 363 N.E.2d 452.) However, the fact that a party has acted in reliance on an attorney's advice is not a complete bar to an action for malicious prosecution. (*Hulcher v. Archer Daniels Midland Co.* (1980), 88 Ill. App. 3d 1, 409 N.E.2d 412.) In *Pratt*, the court quoted from *Brown v. Tucker* (1918), 214 Ill. App. 162, 164:

> " 'When a prosecuting witness before beginning a case goes to a competent attorney and discloses to him in good faith all the facts and information he has as to a supposed offense as well as the source of his information, and then acts on the advice of such attorney and starts a criminal prosecution, he will be considered as having had probable cause for such prosecution, even if afterwards the party charged is found to be not guilty of the offense charged.' " (*Pratt*, 48 Ill. App. 3d at 934-35.)

The supreme court has spoken thus in *Freides v. Sani-Mode Manufacturing Co.* (1965), 33 Ill. 2d 291, 296, 211 N.E.2d 286, 289:

> "While advice of counsel is a defense to a suit for malicious prosecution, its validity depends upon *the facts and circumstances communicated by the defendant to his attorney*, whose advice must be sought, given and acted upon in good faith.

Whether these elements are present is a jury question. [Citations.]" (Emphasis added.)

If disclosure of all the facts and circumstances is necessary to establish the defense of advice of counsel, it necessarily follows that the fact finder must be aware of what facts and circumstances were disclosed to the attorney.

Although we have found no Illinois case dealing directly with the issue of admissibility of the contents of the conversation between a defendant in a malicious prosecution case and an attorney whose advice he sought, our research discloses authority from other jurisdictions. In *Tate v. Connel* (1966), 3 Ariz. App. 534, 416 P.2d 213, the court held that the communications between the defendant in a malicious prosecution action and the attorney who advised the criminal prosecution are admitted, not as exceptions to the hearsay rule, but because the words communicated are not offered for the truth thereof but rather to establish the good faith of the person bringing the prior criminal action. In *Morin v. Moreau* (1914), 112 Me. 471, 92 A. 527, the supreme court of Maine held that the details of a statement made by the defendant to his counsel before instituting the prosecution are not only admissible but "indispensable" to establish an advice-of-counsel defense. 112 Me. at 473, 92 A. at 528.

■ Both *Tate* and *Morin* were relied on, in part, for the following expression of the law:

"One who, in order to show the existence of probable cause for the prosecution complained of, relies on the advice of a licensed attorney, given after full and truthful disclosure of the facts, may prove the details of the statement he made to his counsel before instituting the prosecution. *In fact, the communications with the attorney must be proved,* and then it is for the jury to say whether the statement was true and full. *The defendant cannot be permitted to draw that inference for the jury by testifying in general language that he did make a full statement or that he told all the circumstances; such testimony is insufficient."* (Emphasis added.) 52 Am. Jur. 2d *Malicious Prosecution* §174, at 294 (1970).)

In *Cohen v. Cook* (1969), 62 Tenn. App. 292, 462 S.W.2d 592, *aff'd* (1970), 224 Tenn. 729, 462 S.W.2d 499, the court held that the testimony of a witness was not sufficient to establish probable cause because the witness, who was a judge, did not testify to exactly what the defendant had told him before he issued the warrant. It thus appears, ironically, that if the defendant had herself restricted her proof to the general terms that she had consulted with an attorney and he

advised her to sign the complaint, that testimony would not have been sufficient to establish the defense of advice-of-counsel. We conclude, therefore, that the judge erred in preventing the defendant's attorney from testifying to what the defendant had told him before he advised her to sign a criminal complaint.

We do not find persuasive the plaintiff's argument that no error occurred because the defendant herself did not seek to testify as to the conversation. It is understandable why she sought to prove the conversation through the testimony of her attorney. She was repeatedly characterized by the plaintiff's attorney as a "liar" in his opening statement and in his closing argument. If she had established the conversation through her testimony alone (assuming she would have been permitted to do so), we feel certain that the plaintiff's attorney would have called the jury's attention to the absence of the testimony of her potentially corroborating attorney.

■ The defendant next assigns as error the conduct of the plaintiff's attorney; she maintains that the cumulative effect of specific instances of improper conduct amounted to prejudicial error requiring reversal. During the examination of the defendant as an adverse witness by the plaintiff's attorney, the following exchange took place:

"Q. After all of the evidence, Ms. Kamberos, the judge [in the criminal trial] didn't believe you beyond a reasonable doubt, did he?

[DEFENDANT'S ATTORNEY]: Objection.

THE COURT: Sustained as to the form of the question. Counsel's [sic] admonished.

[PLAINTIFF'S ATTORNEY]: Ms. Kamberos, after the trial John Salmen was found innocent, wasn't he?

THE COURT: Counsel, that's an improper form of question.

[PLAINTIFF'S ATTORNEY]: I'll rephrase it.

THE COURT: Don't do it again.

* * *

A. Yes, the judge entered a decision, not guilty.

[PLAINTIFF'S ATTORNEY]: Not guilty the judge said? Is that your answer, Ms. Kamberos?

A. I can't remember exactly what he said, but * * *

Q. He found John not guilty? Well, you're a lawyer, aren't you?

THE COURT: Just one moment. No colloquy with the witness, please. Just ask questions. If you have an answer, ask another question.

[PLAINTIFF'S ATTORNEY]: I didn't hear her response, judge.

THE COURT: You heard it. Ask another question."

The judge later denied the defendant's motion for a mistrial but indicated that if counsel persisted in improper questioning the judge would consider imposing sanctions.

During the direct examination of Linda Nowak, who also owned a unit in the building, the following exchange took place:

"[PLAINTIFF'S ATTORNEY]: Do you recall at that time learning about certain conflicts between Ms. Kamberos and Mr. Salmen?

A. Yes.

Q. What specifically do you recall learning?

A. At the time there was—I know charges had been brought against John Salmen, and at the time also I know that the Board members felt that John was being unduly harassed.

[DEFENDANT'S ATTORNEY]: Objection as to what somebody else felt, judge. That's not relevant material, and I have a motion.

THE COURT: Sustained.

* * *

[PLAINTIFF'S ATTORNEY]: Do you recall attending a meeting [of the board of directors of the building] in March of 1981?

A. Yes.

Q. Do you recall some of the events that you heard Ms. Kamberos discuss at that meeting?

A. Yes.

Q. What were some of those things you heard Ms. Kamberos do or say at those meetings?

A. There was direction towards complaints towards John Salmen.

Q. And were those complaints reviewed by the Board?

A. Yes.

Q. And what was the Board's action after hearing those complaints?

[DEFENDANT'S ATTORNEY]: I object to what's [sic] the Board's actions. The only issue here is what was said at the meeting.

THE COURT: Sustained.

[PLAINTIFF'S ATTORNEY]: Judge, I believe—

THE COURT: Ask another question.

Q. After hearing the Board discuss the issues, did you note that the Board ever substantiated any of the complaints that were brought by Ms. Kamberos?

[DEFENDANT'S ATTORNEY]: Objection.

THE COURT: Sustained."

At that point the defendant's attorney made another motion for a mistrial, which was denied. In denying the motion the judge made this observation to the plaintiff's attorney:

"All you're introducing is the result of the deliberations of a group called the Board? I don't think that is relevant here. Let's go on."

In spite of that clear ruling by the judge, the plaintiff's attorney persisted in asking Nowak the following question:

"Q. Ms. Nowak, were you ever able personally to substantiate any of the claims that Ms. Kamberos made about John Salmen?"

The judge again sustained the defendant's attorney's objection and instructed the jury to disregard the question.

After Nowak testified, the plaintiff called Sid Woods, a former member of the board of directors, and the following occurred:

"Q. And at that time [April 6, 1981] did the Board of Directors take a vote whether to support John Salmen or Constance Kamberos?

[DEFENDANT'S ATTORNEY]: Objection.

THE COURT: Sustained. See you in side bar."

After a discussion out of the presence of the jury, the judge again said that the objection was sustained and told the plaintiff's attorney that the determination of the board as to the merits of the claim between Kamberos and Salmen was irrelevant. Despite the judge's ruling the plaintiff's attorney persisted in the following exchange:

"Q. Mr. Woods, between June 15, 1981, and July 13, 1981, did you receive a series of letters from Constance Kamberos?

A. Yes, I did.

Q. And did those letters consist of complaints about the janitors?"

An objection to that question was sustained. Finally the plaintiff's attorney asked the following question:

"Q. As a Board member, Mr. Woods, were you able to substantiate a complaint of that letter?"

Again an objection was sustained.

In the face of all that, the plaintiff's attorney still brought out from Woods that Woods was aware that Kamberos had Salmen

charged with the crime of battery on or about June 30, 1981, that the board of directors held a meeting on or about July 16, 1981, that the board voted to pay the plaintiff's legal fees and that the legal fees came from the association which consisted of the unit owners and included the plaintiff. The judge permitted the plaintiff's attorney to establish that part of Kamberos' money went to pay for the plaintiff's legal fees.

Even in this court, the plaintiff argues that we should conclude that the board did not believe Kamberos and that we should consider the board's disbelief in our resolution of the question of the sufficiency of the evidence. We did not consider the board's disbelief in a resolution of the question, and we believe that the objections were properly sustained. Moreover, we do not believe that the jury should have been permitted to hear the board voted to pay the plaintiff's legal fees and, especially, it should not have been permitted to hear that the fees were paid, in part, by the defendant.

It is the plaintiff's principal position that the court's sustaining of the objections and instructing the jury to disregard cured any prejudice to the defendant. In support of his position he cites three cases: *Maciukevicius v. Zagorski* (1988), 172 Ill. App. 3d 303, 526 N.E.2d 569; *Webb v. Angell* (1987), 155 Ill. App. 3d 848, 508 N.E.2d 508; and *Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 501 N.E.2d 830.

We are unable to determine from the *Bresland* opinion what questions were asked to which objections were sustained nor does it appear that the plaintiff in *Bresland* repeatedly persisted in asking improper questions as was done here. Similarly, in *Maciukevicius*, we are unable to determine what questions were improperly asked and how often. We note that the court made the following observation:

> "We have reviewed the challenged questions and objections. Without expressing an opinion as to the correctness of the court's rulings on specific objections, we find that the line of questioning (primarily concerning the medical testimony) was not so far out of line as to constitute improper conduct on the part of plaintiff's counsel." (172 Ill. App. 3d at 310.)

In *Webb*, the court found that some of the assignments of error had been waived for failure to object and reduced its consideration of error to three instances. The court noted that there were two objections to the defense attorney's conduct during the examination of the plaintiff's expert but held that it would not consider those objections since the plaintiff had not properly preserved the question for review. The court did find that one question was improper but, since an objection

to the question was immediately sustained and the jury instructed to disregard the comment, any prejudice from that specific remark was cured.

All of the cases cited by the plaintiff are factually wide of the mark in this case. None of them displays the persistent and insistent improper course of conduct in the face of adverse rulings by the trial judge that this case does. This practice has been criticized and held to be reversible error. See *Geisberger v. Quincy* (1972), 3 Ill. App. 3d 437, 278 N.E.2d 404.

■ We are reluctant to set aside a jury verdict. It is our duty, however, to insure that parties receive a fair trial, and, if we conclude that errors might have affected the jury verdict, it is our obligation to set the verdict aside. As we have previously noted, this case depended on the jury's evaluation of the credibility of the parties. Also as previously noted, the plaintiff's attorney repeatedly characterized the plaintiff as a "liar." His improper questions were designed to show the jury that the judges who heard the criminal complaints against Salmen and the members of the board of directors had also determined that the defendant was a "liar." We conclude that the cumulative errors consisting of the improper restriction of the defendant's proof and the plaintiff's attorney's improper conduct deprived the defendant of a fair trial and might have affected the verdict. For these reasons, the judgment of the circuit court is reversed and the cause is remanded for a new trial. Since no appeal was taken from the judgment in favor of the plaintiff on the defendant's counterclaim, this cause is remanded for a new trial on plaintiff's complaint only.

Reversed and remanded.

McNAMARA and RAKOWSKI, JJ., concur.