*In re* MARRIAGE OF JEFFREY BRESLOW, Petitioner-Appellee, and MARLENE BRESLOW, Respondent-Appellant.

First District (2nd Division)   Nos. 1—97—0706, 1—97—0707 cons.

Opinion filed June 15, 1999.

42

David I. Grund and David C. Adams, both of Grund & Starkopf, P.C., of Chicago, for appellant.

Theodore A. Shapero, Mark A. Rabinowitz, and Paul B. McCarthy, of Rudnick & Wolfe, of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

Marlene Breslow appeals from a final order of dissolution of marriage entered by the circuit court of Cook County and from the court's subsequent *nunc pro tunc* amendment of that order. We find we are without jurisdiction to hear the appeal and accordingly dismiss it.

### FACTS

Jeffrey and Marlene Breslow married in February 1965. Jeffrey filed a petition for dissolution of marriage in the circuit court of Cook County in January 1995 and amended his petition in March 1995. In part relevant to our disposition of this appeal, Jeffrey requested that he "be awarded and assigned his non-marital property and a just proportion of all marital property." Marlene answered the amended petition in April 1996, requesting in pertinent part that she "be awarded an equitable portion of the marital property." Among the marital property Marlene listed in her answer was "[a] business known as Breslow, Morrison and Terzian, Inc., of which Jeffrey's pro rata share of the fair market value of same is more than $6,500,000." After a lengthy trial, the circuit court entered a written judgment

of dissolution of marriage on August 6, 1996. In addition to dissolving the parties' marriage, this order resolved all issues pertaining to the dissolution, including maintenance, division of property, and attorney fees.[1] In its order the court found that the following assets were part of the marital estate:

| "MARITAL PROPERTY/ASSETS | VALUE |
|---|---|
| BRESLOW, MORRISON, TERZIAN & ASSOCIATES | (2,400,000) |
| Brigg's Stock | 1,895,500 |
| 897 Dryden Lane Residence, Highland Park | 525,000 |
| 540 Lake Shore Drive Residence, Chicago: | 350,000 |
| (Including art, furniture and furnishings) | |
| 181 East Lake Shore Drive Condominium, Chicago | 228,000 |
| (Contract interest) | |
| JEFFREY's Cash | 1,105,680 |
| MARLENE's Cash | 140,000 |
| Life Insurance Policies | 100,000 |
| JEFFREY's 401(k) Retirement Plan | 46,100 |
| Park City, Utah Condominium (1/3 Interest) | 15,000 |
| MARLENE's Investment Account | 15,000 |

MARITAL PROPERTY AND STIPULATIONS OF THE PARTIES

Krugerrands

1995 BMW

1993 Jeep

Artwork identified in Petitioner's Exhibit #27

Remaining art, furniture and furnishings at 897
    Dryden Lane, Highland Park

Remaining art, furniture and furnishings at 540
    Lake Shore Drive, Chicago

MARVIN GLASS AND ASSOCIATES LIQUIDATING TRUST."

In its order the court divided the marital assets as follows:

"DISTRIBUTION OF THE MARITAL ASSETS

| DISTRIBUTION OF MARITAL ASSETS TO THE PETITIONER, JEFFREY: | |
|---|---|
| Fifty Percent (50%) of BRESLOW, MORRISON, TERZIAN & ASSOC. | (1,200,000) |
| 540 Lake Shore Drive Residence, Chicago | 350,000 |
| 181 East Lake Shore Drive Condominium (Contract Interest) | 228,000 |
| JEFFREY's Cash | 1,105,680 |

---

[1]There were no custody or child support issues to be resolved because the parties' three children, Marc, Michael, and Joseph, were all emancipated at the time the judgment was entered.

| | |
|---|---:|
| Park City, Utah Condominium (¹/₃ Interest) | 15,000 |
| Fifty Percent (50%) of the Krugerrands | |
| 1993 Jeep | |
| Artwork in Petitioner's Exhibit #27, 'Standing Girl with Hat' | |
| Fifty Percent (50%) of the Remaining Artwork Documented in Petitioner's Exhibit #27 | |
| All remaining art, furniture and furnishings at 540 Lake Shore Drive | |
| *Fifty Percent (50%) of MARVIN GLASS AND ASSOCIATES LIQUIDATING TRUST | |
| (*See Item 4, under MAINTENANCE) | |

DISTRIBUTION OF THE MARITAL ASSETS TO THE
RESPONDENT, MARLENE:

| | |
|---|---:|
| Fifty Percent (50%) of BRESLOW, MORRISON, TERZIAN & ASSOC. | (1,200,000) |
| Brigg's Stock | 1,895,500 |
| 897 Dryden Lane Residence, Highland Park | 525,000 |
| MARLENE's Cash | 140,000 |
| Life Insurance Policies (or cash equivalent) | 100,000 |
| JEFFREY's 401(k) Retirement Plan | 46,100 |
| MARLENE's Investment | 15,000 |
| Fifty Percent (50%) of the Krugerrands | |
| 1995 BMW | |
| Artwork in Petitioner's Exhibit #27, 'Precious Moments' | |
| Fifty Percent (50%) of the Remaining Artwork Documented in Petitioner's Exhibit #27 | |
| All remaining art, furniture and furnishing at 897 Dryden Lane | |
| *Fifty Percent (50%) of MARVIN GLASS AND ASSOCIATES LIQUIDATING TRUST | |
| (*See Item 4, under MAINTENANCE) | |

FURTHERMORE, after the division of the above articulated MARITAL ASSETS to MARLENE, pursuant to this JUDGMENT, MARLENE is due and owing the sum of Six Hundred Eighty-eight Thousand Five Hundred Forty ($688,540) Dollars, to be paid by JEFFREY to MARLENE in monthly installments of Eleven Thousand Four Hundred Seventy-Five ($11,475) Dollars per month with Nine (9%) Percent statutory interest for sixty (60) months, (five [5] years), from the entry of this JUDGMENT, such payments to commence, nunc pro tunc, from August 1, 1996. All payments are due and payable on the first of each month.

* * *

## MAINTENANCE
\* \* \*

4. Upon completion of maintenance payments, but no later than sixty (60) months (five [5] years) from August 1, 1996, JEFFREY shall immediately assign his Fifty (50%) Percent interest in MARVIN GLASS AND ASSOCIATES LIQUIDATING TRUST to MARLENE."

The court also found Jeffrey owed Marlene $61,669 for marital funds he had dissipated.

On August 15, Marlene filed a motion for rule to show cause why Jeffrey should not be held in contempt for his failure to comply with certain of the provisions of the August 6 order of the circuit court. Specifically, she requested in part that Jeffrey be held in contempt for his failure to transfer to her 50% of his shares of Breslow, Morrison, Terzian & Associates (BMT), as she alleged the August 6 order required. She also alleged Jeffrey had failed to comply with numerous other provisions of the August 6 order. On August 30, without having yet responded to Marlene's motion for rule to show cause, Jeffrey filed a motion to clarify or modify the August 6 order, alleging that certain of the circuit court's findings of fact and conclusions of law were erroneous. The motion did not seek to modify or clarify any portion of the August 6 order regarding BMT. On September 9, the circuit court filed an order amending the August 6 order in certain respects. The September 9 order did not amend any portion of the August 6 order dealing with the BMT stock, and it denied a portion of Jeffrey's motion alleging that the requirement that he assign his interest in the Marvin Glass liquidating trust to Marlene after five years was erroneous because the parties had stipulated that they would equally divide the interest in Marvin Glass. At a hearing on the motion, the court stated with respect to this latter point: "I believe I have the authority to do that."

Approximately three months later, on December 2, Jeffrey filed a "Motion to Strike and Response" to Marlene's August 15 motion for rule to show cause. In this motion Jeffrey alleged for the first time that the portion of Marlene's motion for rule to show cause that was based on his purported failure to transfer her the shares of BMT was groundless, because:

"Neither the Judgment nor the reconsidered Order award[s] any 'shares' of the business, BMT, to Marlene. Neither order, therefore, directs the 'transfer' of any 'shares' by Jeffrey to Marlene. Marlene never argued for or sought, in closing argument, the award of shares. Marlene was awarded, as and for her interest in the corporation, other property of the estate, including, without limita-

tion, a cash to balance distribution of $688,540, payable over five years."

Jeffrey noted that if he had been awarded the entire $2,400,000, the $688,540 payment he was ordered to make to Marlene would give each party exactly the same dollar amount of marital assets. He argued, therefore, that the court had awarded all of the BMT stock to him and "satisfied Marlene's interest in the business by the award of other property"—specifically, the $688,540 cash payment. Marlene responded that (1) the language of the order was contrary to Jeffrey's interpretation, (2) it was too late to modify the order, as the "Motion to Strike and Response" had been filed more than 30 days after the final order was entered, and (3) Jeffrey should be estopped from arguing that he was not required to transfer the shares to her, as she had relied on Jeffrey's failure to contest that provision of the order in her decision not to appeal the circuit court's valuation of BMT.

In the record before us the trial court never entered a ruling on Marlene's motion for a rule to show cause. However, on January 15, 1997, the circuit court entered an order purporting to modify the August 6 order *nunc pro tunc*. That order, which reveals on its face that it was prepared by counsel for Jeffrey, reads in full as follows:

"THIS CAUSE coming on before Judge Daniel Sullivan, Calendar 13, pursuant to order of December 19, 1996, for the expressly limited purpose of interpretation of certain language in the Judgment for Dissolution of Marriage, entered by him in this cause August 6, 1996; the Court having entered a subsequent order September 9, 1996 on Petitioner's Motion pursuant to 735 ILCS 5/2—1203; the parties being present by counsel; the court having jurisdiction over the parties and the subject matter; the Court being duly and fully advised in the premises; and the Court, having consulted the record of this cause, including without limitation its notes, memoranda and other records, does hereby find and order:

The Court HEREBY FINDS that there is no ambiguity in the Judgment for Dissolution entered in this cause August 6, 1996 and in the September 9, 1996 order; and that, specifically, Respondent MARLENE BRESLOW was not awarded shares or an interest of any kind in Breslow, Morrison, Terzian and Associates, but offsetting property in the nature of other assets, including a cash payout, over five years.

The Court further finds that this finding is expressly a nunc pro tunc amendment of the record and so orders:

IT IS HEREBY ORDERED that this order is entered nunc pro tunc August 6, 1996.

IT IS FURTHER ORDERED that this cause be and is herewith transferred to the post-decree calendar, Calendar 11, in its entirety, instanter."

At the January 15 hearing which occurred prior to the court entering the above order, counsel for Jeffrey quoted from an order from Judge Santiago assigning the matter to Judge Sullivan "to consider pending matters of interpretation of the judgment and supplement to the judgment."[2] The court in this case (Judge Sullivan) stated:

"Right. We came back here last week[3] for me to tell you exactly what I felt that this Court should do in this particular case, albeit [sic] interpreting or enforcing or whatever on all those other court orders.

I stated that I believed it was sent to me for the limited purpose of giving my interpretation of my judgment[.] *** That's what I see us here for today.

I guess the only way to do this is obviously look back on my judgment[.] ***

*** '

*** Page 3 of the judgment, I listed at the top here, it says, 'Court finds that the marital estate consists of the following:' Now, items that I was either able to put a number on or were stipulated to I listed the best I could. I wanted to put everything under this first category, but some of them I was unable to.
***

I gave a money value. I assigned basically a money value to Jeffrey Breslow's interest in [BMT] of 2.4 million. Now, obviously, that means I gave their expert weight—his testimony more weight, credibility than yours. That's just the way I saw it. So I value that at $2.4 million. Nothing to do with stocks or shares. I don't think the word stocks or shares [is] ever even mentioned in my judgment. I put it in parentheses because that's basically a value I am assigning that's really not money that's there right now. I put that in parentheses because it was going to be part of the overall division that I came up with."

The court stated that it divided the assets to which it was able to assign a value "50/50. And again, it is a little tricky because the 2.4 million isn't exactly—it's not cash on hand, it's the money value of Jeffrey's interest in [BMT]. I assigned these assets to Marlene on Page 4." The court stated that it did not assign any shares of stock to Marlene and it "wouldn't have the power to assign 50 percent of [BMT], so that was certainly out the window."

Counsel for Marlene argued that this interpretation of the August

---

[2]The order from which counsel purported to quote does not appear to be contained in the record before this Court.

[3]The record before us does not contain a transcript of any other hearing occurring during the month of January.

6 order was contrary to the clear language of that order and that the reason Marlene had not appealed the court's valuation of BMT was that she believed she had been assigned 50% of the stock itself, which made valuation irrelevant. The court stated that "[w]e're here for the limited purpose of me interpreting the judgment. I've done that. That's it." Shortly thereafter, the following colloquy ensued:

"THE COURT: You know, the judgment was entered back in August, is that correct?

MR. MANTYNBAND: That's correct. August 6th. And Your Honor has said the judgment is clear. Your Honor has referred to no notes—

THE COURT: I thought it was clear on that date, Mr. Mantynband. You had within 30 days of that date to come in and—

MR. MANTYNBAND: I thought it was clear too, Judge. 50 percent means 50 percent.

THE COURT: I am signing this order. You take the next step, sir. That's all.

\*\*\*

MR. MANTYNBAND: Your Honor, as I understand it, there was no notes, no memorandum of the clerk's register on this—

THE COURT: That's it. Case closed. Good-bye."

Marlene filed the instant appeal on February 8, 1997, within 30 days after the court entered the purported *nunc pro tunc* order. She argues that the circuit court erred in its valuation of BMT and in its finding that Jeffrey had only dissipated $61,669 of marital assets. Jeffrey urges us to affirm the circuit court but argues as a threshold matter that the appeal should be dismissed for lack of jurisdiction. We find we lack jurisdiction in this case, although not solely for the reasons that Jeffrey suggests.[4] As shall be explained below, we find that the circuit court's order of January 15 was not a valid *nunc pro tunc* order, and accordingly it was void *ab initio* because the court was without jurisdiction to enter it. The appeal must thus be dismissed for lack of jurisdiction because the issues Marlene raises deal only with the final order, from which she did not file a timely notice of appeal.

## ANALYSIS

While we have found that our jurisdiction was not defeated by the continued pendency of Marlene's motion for a rule to show cause,[5] we are nevertheless without jurisdiction because the appeal is untimely.

---

[4]Jeffrey contends that Marlene's notice of appeal had to be filed before October 9 (30 days after September 9), notwithstanding the January 15 *nunc pro tunc* order.

[5]Our discussion of the jurisdictional issue created by the pendency of

We find we are without jurisdiction to entertain the instant appeal because Marlene did not file a timely notice of appeal from the September order which disposed of the last pending posttrial motion and because the January *nunc pro tunc* order was void and thus the notice of appeal from that order cannot support our jurisdiction over an appeal from the merits of the original final order.

■ We begin here with the general proposition that orders entered by a court without jurisdiction of both of the parties and of the subject matter are void *ab initio* and are subject to attack at any time. *In re Marriage of Mitchell*, 181 Ill. 2d 169, 174, 692 N.E.2d 281, 284 (1998). Even though a court has jurisdiction of both subject matter and parties, it loses jurisdiction once 30 days have elapsed after entry of a final judgment in the case or, if timely posttrial motions are filed, once 30 days have elapsed after disposition of the last timely filed posttrial motion. *Beck v. Stepp*, 144 Ill. 2d 232, 238, 579 N.E.2d 824, 827 (1991); *Gegenhuber v. Hystopolis Production, Inc.*, 277 Ill. App. 3d 429, 431, 660 N.E.2d 107, 109 (1995).

In this case there is no question that the circuit court had jurisdiction over both Jeffrey and Marlene and the subject matter of the lawsuit—their marriage—until August 6. However, on that date the court entered a final order in the case. Although Jeffrey filed a posttrial motion to clarify or modify the August 6 order, the court made a final and complete disposition of that motion on September 9. Marlene did not file any posttrial motion with respect to the August 6 order, and neither party filed a posttrial motion after the September 9 order.[6] Accordingly, the court lost jurisdiction of the case on October 9, 30 days after September 9. *In re Application of the County Collector*, 281

_____

contempt issues is fully discussed in the unpublished portion of this opinion but had to be deleted from the published portion because of the page restrictions imposed by revised Supreme Court Rule 23 (166 Ill. 2d R. 23). A full copy of the published and unpublished portions of this disposition is on file with the clerk of this court under docket No. 1—97—0706.

[6]As previously discussed, Marlene's motion for rule to show cause was not a posttrial motion because it was not brought against the judgment and did not request a " 'rehearing, or a retrial, or a modification of the judgment or to vacate the judgment or for other relief' " similar in nature to the other forms of relief. See *Marsh v. Evangelical Covenant Church*, 138 Ill. 2d 458, 460, 563 N.E.2d 459, 461-62 (1990), quoting Ill. Rev. Stat. 1987, ch. 110, par. 2—1203(a) (now 735 ILCS 5/2—1203(a) (West 1996)). It is not clear whether Jeffrey's response to Marlene's motion for rule to show cause could be construed as a motion to modify the judgment, but even assuming *arguendo* that it could, it would not constitute a proper postjudgment motion because it was filed more than 30 days after September 9.

Ill. App. 3d 467, 478, 667 N.E.2d 109, 116 (1996) (although normally court loses jurisdiction over a matter once 30 days have passed, the filing of a postjudgment motion delays the running of the 30-day period); *In re Marriage of Agustsson*, 223 Ill. App. 3d 510, 515, 585 N.E.2d 207, 211 (1992) (same).

■ As previously noted, orders entered by a court without jurisdiction over the subject matter of the litigation or a party thereto are ordinarily void *ab initio*. However, notwithstanding the general rule that the circuit court retains jurisdiction only for 30 days after entry of a final order, a court may modify its judgment *nunc pro tunc* at any time. *Beck*, 144 Ill. 2d at 238, 579 N.E.2d at 827. *Nunc pro tunc* orders are employed by courts to correct clerical errors in written orders and thereby make final orders entered in a case conform to the actual judgment of the court. *Beck*, 144 Ill. 2d at 238, 579 N.E.2d at 827 (a court may enter a *nunc pro tunc* order "to correct a clerical error or matter of form so that the record conforms to the judgment actually rendered by the court"; the purpose of such an order "is to correct the record of judgment, not to alter the actual judgment of the court"); *Gegenhuber*, 277 Ill. App. 3d at 432, 660 N.E.2d at 110. The order the court entered on January 15 purported to be a *nunc pro tunc* order; if this is a correct characterization of the order, the court properly could have entered it notwithstanding that it had lost jurisdiction of the case due to the passage of more than 30 days after disposition of the last timely posttrial motion. *Beck*, 144 Ill. 2d at 238, 579 N.E.2d at 827.

The first difficulty with our jurisdiction in this case is that the arguments Marlene raises on appeal only relate to the original August 6 order from which she never directly appealed.[7] Marlene admits that she did not appeal within 30 days after September 9, but she explains this by stating that under her interpretation of the August 6 and September 9 orders, she was to receive 50% of Jeffrey's stock in BMT, which made the valuation irrelevant. She also states that the *nunc pro tunc* order in January changed the result in the case and, accordingly, "the amended final judgment in this action was not entered until January 15, 1997."

First, we reject Marlene's contention that there was no final order before January 15, 1997. This argument is belied by Marlene's own contention in reply to Jeffrey's response to her motion for a rule to show cause that the circuit court had lost jurisdiction to modify the

---

[7]Because Jeffrey's posttrial motion was not disposed of until September 9, Marlene actually had until October 9 to file a notice of appeal. However, she did not file a notice of appeal before that date.

judgment because more than 30 days had elapsed since the entry of the August 6 and September 9 orders. Moreover, the argument misperceives the nature of *nunc pro tunc* orders.

■ A *nunc pro tunc* order may itself properly be treated as an appealable order, because it would be manifestly unfair to allow a party no avenue in which to seek appellate review of the propriety of such an order. Accordingly, although a *nunc pro tunc* order for some purposes "relates back" to the time of the order it corrects, it does not relate back "in such a manner as to make it impossible to file a notice of appeal within the time required" by the supreme court rules. *People v. Jones*, 104 Ill. 2d 268, 278, 472 N.E.2d 455, 459 (1984) ("[t]he effective date of the order by virtue of the *nunc pro tunc* provisions may have been July 24, 1981, but the date of its entry for purposes of appeal was November 6, 1981"). *Cf. People ex rel. Byrnes v. Stanard*, 9 Ill. 2d 372, 375, 137 N.E.2d 829, 830-31 (1956) (stating that for a court to be able to preclude appellate review by entering a void order then amending that order *nunc pro tunc* after the time for appeal from the first order had expired "would clearly be violative of the statutory provisions pertaining to this aspect of our appellate practice and procedure"; accordingly, the time for appeal ran from the time of entry of the *nunc pro tunc* order). See also *Kooyenga v. Hertz Equipment Rentals, Inc.*, 79 Ill. App. 3d 1051, 1059, 399 N.E.2d 216, 222 (1979) ("a judgment is not effective as of the date to which it expressly relates back if such effectiveness would deny to any proper party the right to review by a higher court [citations]; the test being whether the party could have obtained the desired review before the *nunc pro tunc* order was made"); *Barnett v. Werner*, 13 Ill. App. 2d 494, 497, 142 N.E.2d 830, 832 (1957) (treating *nunc pro tunc* order as a final, appealable order). Moreover, the end result of a successful challenge to a *nunc pro tunc* order is that the order will be found void. See *Beck*, 144 Ill. 2d at 242, 579 N.E.2d at 829 ("the trial court's *nunc pro tunc* modification of its earlier order was improper and therefore void"). Thus it would appear that a *nunc pro tunc* order could also be challenged under the general rule that a void order may be attacked at any time. See *Marriage of Mitchell*, 181 Ill. 2d at 174, 692 N.E.2d at 284.

■ ■ However, we are aware of no authority for the proposition that the entry of a *nunc pro tunc* order somehow has the effect of "unfinalizing" a prior final judgment. This is contrary to the very nature of a *nunc pro tunc* order, that it is an exception to the general rule that a court may not enter an order in a case once it has lost jurisdiction due to the passage of time *after the entry of a final order*. See *Beck*, 144 Ill. 2d at 238, 579 N.E.2d at 827. The fact that a *nunc pro tunc* order is itself appealable does not connote that once a *nunc pro*

*tunc* order has been entered a party may, in an appeal from the *nunc pro tunc* order, challenge provisions of the underlying order that was corrected *nunc pro tunc*. In fact, the only authority of which we are aware holds directly to the contrary, that a party may not use an appeal from a *nunc pro tunc* order as a vehicle for attacking portions of a final judgment from which the time to appeal has elapsed. See *Pagano v. Rand Materials Handling Equipment Co.*, 249 Ill. App. 3d 995, 1001, 621 N.E.2d 26, 30 (1993) ("Having failed to file a timely appeal, plaintiff cannot now [challenge the propriety of earlier final orders] under the guise of a challenge to the *nunc pro tunc* amendment to" one of those orders); *In re Marriage of Hillinger*, 146 Ill. App. 3d 549, 555, 497 N.E.2d 112, 116 (1986) (holding that a party's motion to reconsider final judgment and notice of appeal were untimely even though filed within 30 days after *nunc pro tunc* order attaching exhibits to final judgment); *Kooyenga*, 79 Ill. App. 3d at 1059, 399 N.E.2d at 222 (a party may not "take advantage of a clerical error as a means for perfecting an appeal from a judgment it had previously made a conscious determination not to appeal"). *Barnett*, upon which Marlene relies, is not to the contrary, because none of the issues on appeal in that case involved the order that had been modified *nunc pro tunc*. See *Barnett*, 13 Ill. App. 2d at 497-99, 142 N.E.2d at 832-33.[8]

We recognize the potential equitable concerns raised by the above rule. If, as Marlene claims, she honestly interpreted the trial court's original order as awarding her 50% of Jeffrey's stock in BMT, she would have had no reason to appeal the trial court's valuation of the stock. If she were entitled to half of the stock *itself*, the value the trial court placed on the stock would have been irrelevant to her. Once the

---

[8]The main issues on appeal in *Barnett* concerned the propriety of the *nunc pro tunc* order itself, which clearly in no wise aids Marlene's attempt to challenge the underlying order in the instant case. The only issue the court mentioned that did not directly concern the validity of that order was a contention that the court acted improperly in allowing a substitute estate administrator to be substituted as plaintiff in the case approximately 13 months after entry of the original order dismissing the case. After the court allowed the substitution, the substituted plaintiff filed the motion requesting the *nunc pro tunc* order being reviewed on appeal. Arguably the challenge to the court's allowing the motion to substitute could be construed as a challenge to the *nunc pro tunc* order, because if the substitution had been improper the plaintiff would not have had standing to file the motion requesting the *nunc pro tunc* order. In any event, the appellate challenge to the substitution cannot be construed as a challenge to the order that was amended *nunc pro tunc*, which was entered more than a year before the motion for substitution was filed. See *Barnett*, 13 Ill. App. 2d at 496-97, 142 N.E.2d at 832.

court entered its *nunc pro tunc* order, however, the accuracy of the court's valuation of the stock became critical because, contrary to her previous understanding, Marlene was not entitled to the stock itself, she was entitled only to a cash payment equivalent to half of the court's valuation of the stock in the August 6 judgment. Notions of fair play would seem to militate in favor of allowing Marlene to question the trial court's valuation of the stock in that circumstance.[9] On the other hand, there exist competing concerns in favor of finality of judgments and an end to litigation. But more overridingly, we simply cannot review the merits of a final order from which no timely notice of appeal was filed, notwithstanding the fact that there was no motivation for such an appeal until after the entry of the *nunc pro tunc* order. "The timely filing of a notice of appeal is both jurisdictional and mandatory." *E.g., R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 159, 692 N.E.2d 306, 310 (1998). As an appellate court, we are without authority to " 'excuse compliance with the filing requirements of the supreme court rules governing appeals.' " *Mitchell v. Fiat-Allis, Inc.*, 158 Ill. 2d 143, 150, 632 N.E.2d 1010, 1012 (1994), quoting *In re Smith*, 80 Ill. App. 3d 380, 382, 399 N.E.2d 701 (1980).

However, in the final event, we need not determine whether in a proper case there should or could be carved out an exception to the general rule enunciated in *Pagano* and *Kooyenga*, because in *this* case the January 15 order was not a proper *nunc pro tunc* order. Accordingly, there is no basis for excusing Marlene's failure to file a timely appeal of the original order.

As previously noted, the purpose of a *nunc pro tunc* order is to "correct the record of judgment," to "correct a clerical error or matter of form so that the record conforms to the judgment actually rendered by the court." *Beck*, 144 Ill. 2d at 238, 579 N.E.2d at 827. The evidence supporting the *nunc pro tunc* order "must clearly demonstrate that the order being modified *fails to conform to the decree actually rendered by the court*." (Emphasis added.) *Beck*, 144 Ill. 2d at 238, 579 N.E.2d at 827. " 'The office of an order *nunc pro tunc* is only to supply some omission in the record of an order which was really made, but omitted from the record.' " *People v. Rosenwald*, 266 Ill. 548, 554, 107

---

[9]However, we see no equitable merit to allowing Marlene to raise the other issue she brings up on appeal with this court, namely, whether the amount of marital assets the trial court found Jeffrey to have dissipated was against the manifest weight of the evidence. The *nunc pro tunc* order did not even touch on this portion of the judgment of dissolution, and we see no basis for holding *nunc pro tunc* orders resurrect any and all potential challenges to the orders they amend, even challenges to such portions of the prior orders that the *nunc pro tunc* order leaves wholly unchanged.

N.E. 854, 856 (1915), quoting *Lindauer v. Pease*, 192 Ill. 456, 459, 61 N.E. 454, 455 (1901); accord *Gill v. Gill*, 56 Ill. 2d 139, 142, 306 N.E.2d 281, 282 (1973); *Maywood Proviso State Bank v. Village of Lisle*, 234 Ill. App. 3d 206, 214, 599 N.E.2d 481, 487 (1992); *Phil Dressler & Associates, Inc. v. Old Oak Brook Investment Corp.*, 192 Ill. App. 3d 577, 581, 548 N.E.2d 1343 (1989). "[A] *nunc pro tunc* order serves merely to correct a prior order which *incorrectly* reflects what the trial court actually ruled at that time." (Emphasis added.) *People ex rel. Department of Human Rights v. Arlington Park Race Track Corp.*, 122 Ill. App. 3d 517, 524, 461 N.E.2d 505, 510 (1984), citing *Bradley v. Burrell*, 97 Ill. App. 3d 979, 981, 424 N.E.2d 15, 17 (1981). Upon a motion for a *nunc pro tunc* order, "[t]he court is not called on to construe the judgment, but only to enter of record such judgment as was formerly rendered and *not* entered of record as rendered." (Emphasis added.) 49 C.J.S. *Judgments* § 128a, at 201 (1997). See also 49 C.J.S. *Judgments* § 124, at 198 (1997) ("A purported nunc pro tunc entry of judgment is erroneous where it fails to disclose the ground on which the court acts or what the entry is intended to *correct*" (emphasis added)).

■ The above authorities may differ in nuance, but they are uniform as to the fundamental proposition that a *nunc pro tunc* order may only properly be entered to correct a clerical error, so that the record will accurately reflect the actual judgment of the court. The purported *nunc pro tunc* order entered by the court in the instant case did not perform this function. That order itself explicitly stated that (1) the court understood its role as "the expressly limited purpose of *interpretation*," not correction, of the August 6 order, and (2) "there is *no ambiguity* in the" August 6 and September 9 orders. (Emphasis added.) Looking to the substance of the order, it does not purport to change or amend the provisions of the previous order; rather, it merely interprets it. The comments of the court at the January 15 hearing are also replete with statements to the effect that the original orders were clear and unambiguous. In other words, the court found that the record *already* accurately reflected its judgment. Jeffrey affirmatively maintains this position on appeal, stating that the January 15 order "only confirmed that the Judgment was clear on its face." This being the case, the January 15 order did not correct a clerical error. Rather, the court entered the January 15 order to "explain" what it meant in the August 6 order. Clarification, however, is not a proper purpose for a *nunc pro tunc* order. 49 C.J.S. *Judgments* § 128a, at 201 (1997); see also generally authorities cited above.

We recognize that interpretation or clarification of an order (what the trial court did in this case) and correction of a clerical error in an order (which is according to the above authority the only proper

purpose of a *nunc pro tunc* order) share some significant similarities. In both contexts the attention of the circuit court is directed to its original *intent, i.e.*, the court is asked to *remember* its original judgment, not to revisit it. By contrast, a motion for modification or reconsideration of a judgment draws the attention of the court to the merits of the case and suggests that the court's original decision (assuming that the order implements it accurately) was at least partially wrong.

We are aware that there exist cases in which the terms "clarification" and "interpretation" have been used to describe *nunc pro tunc* orders entered by a trial court. *E.g., Kellett v. Roberts*, 276 Ill. App. 3d 164, 169, 658 N.E.2d 496, 501 (1995); *Baley v. Tonti*, 174 Ill. App. 3d 828, 831, 529 N.E.2d 35, 36 (1988); *In re Marriage of Hirsch*, 135 Ill. App. 3d 945, 482 N.E.2d 625 (1985). However, in none of those cases did the reviewing court directly approve or even address the propriety of the use of a *nunc pro tunc* order only to clarify or interpret an order (rather than to correct a clerical error) after jurisdiction had otherwise been lost. In *Kellett* the *nunc pro tunc* order was entered in response to a motion for reconsideration filed three days after the final order was entered. *Kellett*, 276 Ill. App. 3d at 168, 658 N.E.2d at 500. Accordingly, the court still had jurisdiction over the case at the time it entered the order. This would appear most likely also to be the case in *Baley*. See 174 Ill. App. 3d at 831, 529 N.E.2d at 36 (final judgment entered on August 11, *nunc pro tunc* order entered on September 22 in response to an intervening posttrial motion). And although *Marriage of Hirsch* does refer to the *nunc pro tunc* order entered therein as "clarifying" a previous order, it also refers to the *nunc pro tunc* order as "correcting" the prior order. See *Marriage of Hirsch*, 135 Ill. App. 3d at 950, 955, 482 N.E.2d at 629, 632 ("the court on May 21, 1982, ordered a correction *nunc pro tunc*"; "[t]he *nunc pro tunc* order in this case corrected the judgment of February 18, 1982"). Moreover, independent of the court's characterization of the *nunc pro tunc* order, a careful reading of *Marriage of Hirsch* reveals that the trial court did in fact amend the earlier order.

The January 15 order in this case is different. It does not amend the prior order nor does it even purport to do so. It merely interprets the prior order. However close the above cases might come to the line between proper and improper *nunc pro tunc* orders, this case crosses that line. See *Beck*, 144 Ill. 2d at 238-39, 579 N.E.2d at 827 (the order being modified must clearly "fail[ ] to conform to the decree actually rendered by the court"); *Arlington Park*, 122 Ill. App. 3d at 524, 461 N.E.2d at 510 ("a *nunc pro tunc* order serves merely to correct a prior order which *incorrectly* reflects what the trial court actually ruled at

that time"); 49 C.J.S. *Judgments* § 128a, at 201 (1997) (upon a motion for a *nunc pro tunc* order "[t]he court is not called on to construe the judgment, but only to enter of record such judgment as was formerly rendered and not entered of record as rendered").

Since the January 15 order was not a proper *nunc pro tunc* order, the trial court was without jurisdiction to enter that order, because more than 30 days had elapsed since the court entered its (September 9) order disposing of the last pending posttrial motion. See *Application of County Collector*, 281 Ill. App. 3d at 478, 667 N.E.2d at 116; *Marriage of Agustsson*, 223 Ill. App. 3d at 515, 585 N.E.2d at 211. Since the court exceeded its jurisdiction in entering the order, the order was void. *Marriage of Mitchell*, 181 Ill. 2d at 174, 692 N.E.2d at 284. Because the order was void, the ruling which that order purported to amend must be reinstated. *Beck*, 144 Ill. 2d at 242, 579 N.E.2d at 829. Accordingly, the judgment of the circuit court of Cook County must be modified to restore the original judgment order of August 6, as amended by the order of September 9. See 155 Ill. 2d R. 366(a)(1) (the appellate court may "exercise all or any of the powers of amendment of the trial court"); *Gegenhuber*, 277 Ill. App. 3d at 432-33, 660 N.E.2d at 109-10 (modifying judgment of the circuit court).

The fact that the *nunc pro tunc* order was void requires us to dismiss the substantive portions of the appeal. As previously noted, Marlene had the opportunity to file an appeal within 30 days after September 9, and she failed to do so. Accordingly, if the *nunc pro tunc* order had never been entered, we would clearly be without jurisdiction to consider any appeal from the substantive portions of the final order. *Mitchell*, 158 Ill. 2d 143, 632 N.E.2d 1010 (appeal must be dismissed when appellant has failed to file notice of appeal within 30 days after entry of final judgment); *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 539, 470 N.E.2d 290, 292 (1984); *In re Marriage of Wisniewski*, 286 Ill. App. 3d 236, 242, 675 N.E.2d 1362, 1367 (1997); *Clark v. Han*, 272 Ill. App. 3d 981, 985, 651 N.E.2d 549, 551 (1995). The purported *nunc pro tunc* order does not alter the application of the above rule, since, because that order is void, it is as if it were never entered. *National Bank v. Multi National Industries, Inc.*, 286 Ill. App. 3d 638, 640, 678 N.E.2d 7, 9 (1997) (void orders "are a complete nullity from their inception and have no legal effect"; such orders "may not change the status of a case"); *Wilder v. Finnegan*, 267 Ill. App. 3d 422, 425, 642 N.E.2d 496, 499 (1994) ("a void order can be attacked at any time and is from its inception a complete nullity and without legal effect"); *In re Application of the Cook County Collector for Judgment & Sale Against Lands & Lots Returned Delinquent for Nonpayment of General Taxes for the Year 1985*, 228 Ill. App. 3d 719, 731, 593 N.E.2d 538,

547 (1991) (void orders are "a complete nullity and without legal effect"). Accordingly, there is no jurisdictional basis for Marlene to maintain any appellate challenge to the final judgment in the dissolution case.[10]

Although we have found that the purported *nunc pro tunc* order was entered without jurisdiction, this does not leave the judgment without any further potential for explanation or clarification. We note that the general rule is that judgments may be construed like other written instruments. *In re Marriage of Plymale*, 172 Ill. App. 3d 455, 459, 526 N.E.2d 882, 884 (1988); 50 C.J.S. *Judgment* § 534a, at 91 (1997). For instance, although an unambiguous judgment must be enforced as drafted, an ambiguous judgment may be read in conjunction with the entire record and construed in accordance therewith. *Marriage of Plymale*, 172 Ill. App. 3d at 459, 526 N.E.2d at 884; 50 C.J.S. *Judgment* § 534b, at 93-94 (1997). *Cf.* 50 C.J.S. *Judgment* § 534b, at 94 (1997) ("the rule that a judgment which is ambiguous should be read in connection with the entire record and construed accordingly does not permit supplementation of the record by parol evidence"). The fact that a final order may require interpretation does not by virtue of its ambiguity permit a *nunc pro tunc* determination of its meaning in the proceeding in which it was entered; rather, an order will ordinarily be interpreted in the context of a subsequent enforcement proceeding. Although such an interpretation might be challenged in an appeal from the enforcement proceeding, it will not create a jurisdictional basis for an appeal in the original proceeding from the final order itself.

Finally, we are aware that on December 24, 1997, a panel of this court denied Jeffrey's motion to dismiss the appeal on jurisdictional grounds. However, the denial of a motion to dismiss an appeal is not final, and the question of our jurisdiction to hear a case may be revisited at any time before final disposition of the appeal. *Hwang v. Tyler*, 253 Ill. App. 3d 43, 45, 625 N.E.2d 243, 245 (1993); *Phil Dressler & Associates, Inc. v. Old Oak Brook Investment Corp.*, 192 Ill. App. 3d 577, 580, 548 N.E.2d 1343, 1345 (1989); *Carter v. Chicago & Illinois*

---

[10]Presumably, now that the original final order of August 6 (as modified by the order of September 9) has been restored, Marlene would in all likelihood revert to her original position of having no desire to appeal the valuation of the BMT stock because of her belief that the original order entitled her to in-kind distribution. While Marlene might still wish to prosecute her appeal from that portion of the final order dealing with the amount of dissipation, as previously noted, there is no basis for excusing her failure to file a timely notice of appeal on this issue, especially in light of the fact that the purported *nunc pro tunc* order left untouched this portion of the final order.

*Midland Ry. Co.*, 144 Ill. App. 3d 437, 439, 494 N.E.2d 892, 894 (1986), *rev'd on other grounds*, 119 Ill. 2d 296, 518 N.E.2d 1031 (1988); *Mount Vernon Girl Scout Council v. Girl Scouts of United States of America*, 55 Ill. App. 2d 443, 448, 205 N.E.2d 474, 477 (1965). See also generally *Hess v. I.R.E. Real Estate Income Fund, Ltd.*, 255 Ill. App. 3d 790, 798, 629 N.E.2d 520, 525 (1993) ("[t]he denial of a motion to dismiss made in the reviewing court does not bind the court. Such rulings are not unassailable, but rather are open to reconsideration"); *Smith v. Intergovernmental Solid Waste Disposal Ass'n*, 239 Ill. App. 3d 123, 133, 605 N.E.2d 654, 660 (1992) (same). As a reviewing court we have the obligation to be certain of our jurisdiction before proceeding in a cause of action. *R.W. Dunteman Co.*, 181 Ill. 2d at 159, 692 N.E.2d at 310. After our examination of the entire record and the briefs and arguments of the parties, we are of the opinion that the appeal must in fact be dismissed.

### CONCLUSION

The January 15 order entered by the circuit court was not a proper *nunc pro tunc* order, because it merely interpreted the order the court had previously entered. Since the order was entered more than 30 days after the court disposed of the last posttrial motion, the entry of the order was an act beyond the jurisdiction of the circuit court and the order was therefore void. Since the January 15 order was void, the August 6 final order (as modified by the order of September 9) is reinstated. However, because there was no timely notice of appeal filed from the September order disposing of the last posttrial motion, we are without jurisdiction to entertain the merits of the instant appeal. It is therefore dismissed.

Order of January 15 stricken as void; orders of August 6 and September 9 reinstated; appeal dismissed.

Appeal dismissed.

McNULTY and COUSINS, JJ., concur.