FOURTH DIVISION

              June 5, 2003

Nos.1-02-1368, 1-02-1369, consolidated

MELISSA JOHNSON, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

) No. 99 L 6

)

TARGET STORES, INC., and RUBEN GARCIA, ) Honorable

) Edward R. Burr,

Defendants-Appellants. ) Judge Presiding.

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff Melissa Johnson, a former employee of a Target store in Evanston, was arrested for retail theft from the store and was terminated from her employment.  Ruben Garcia, a former Target security guard, signed the criminal complaint against the plaintiff that commenced criminal proceedings against her.  After the charges were dismissed on the State's motion to strike the case off the call with leave to reinstate, the plaintiff brought suit against Target and Garcia for false arrest and malicious prosecution.

After a five-day jury trial, the jury tendered a verdict in favor of  Target and Garcia on the false arrest claims and against Target and Garcia for the malicious prosecution claims.  The trial court denied Target's posttrial motion for judgment notwithstanding the verdict, for a new trial, or a remittitur, and later denied Target and Garcia's motion to enter a 
nunc pro tunc
 order to correct the court's order and dismiss Garcia as a defendant.  Defendants now appeal and argue: (1) that the trial court erred in denying the defendants' motion for entry of a 
nunc pro tunc
 order dismissing Garcia as a defendant; (2) the trial court erred in not granting Target's motion for judgment notwithstanding the verdict or for a new trial; (3) the jury's verdict against Target is against the manifest weight of the evidence; (4) the trial court erred in instructing the jury; and (5) the punitive and compensatory damages awarded by the jury were not supported by the evidence.  

Because we find that the jury intentionally dismissed Garcia as a defendant and that Target had the requisite probable cause to arrest the plaintiff and commence prosecution against her
, we reverse, whereas the dissent would have us reverse and remand.  Notwithstanding the errors relating to the jury's verdict and judgment, however, we also find the plethora of evidence cited both in our decision and in the dissent does not reveal a scintilla of evidence that would allow a finder of fact to determine that Target acted with malice – another essential element to a cause of action for malicious prosecution.

By way of background, Target operates a chain of retail stores and maintains a security function at each store that it refers to as "assets protection."  As to be expected, the assets protection department is responsible for preventing, investigating, and processing incidents of customer and employee theft.  Positions within the assets protection department include the district assets protection team leader (DAPTL), the assets protection team leader (APTL), the senior assets protection specialist (Senior APS), and the assets protection specialist (APS).  The DAPTL is responsible for assets protection at several stores within his or her district, the APTL is responsible for assets protection at a particular store, and the Senior APS and APS are hourly security employees.

Target has a general policy that requires its cashiers to separately scan the bar code of each item presented for purchase, even if a customer purchases several of the same items, and then place the item in the customer's bag.  When an item is scanned, the bar code and the price are recorded by a computer and are then printed on a receipt.  According to policy, therefore, when assets protection personnel observe a cashier hand-keying merchandise information into the computer instead of scanning and bagging, that raises a red flag that something is being done improperly.

On January 16, 1998, plaintiff was a supervisor for Target's in-store cafeteria, Food Avenue, and her responsibilities included food service, food preparation, and operating the cash register.  Apparently because Food Avenue was a separate entity within Target, "she did not know all Target policy."  Prior to that date, she had a verbal exchange with Garcia, who was a Senior APS, regarding her fiance.  Specifically, she testified at trial that she was engaged to Victor, Victor has a stepmother named Alice, Alice's family did not like Victor dating the plaintiff, Garcia is friends with Alice, and Garcia told the plaintiff that she and Victor should not be dating.

Following her shift that day, plaintiff was shopping in the store while waiting for another Target employee, Gwen Curtis, to get off work.  When Curtis's shift ended, she joined plaintiff shopping in the store and began using the same shopping cart.  Unbeknownst to them, they were under surveillance by APS Corey Claybon because of what was described as their "suspicious" selection of merchandise. When they finished shopping, Curtis and the plaintiff entered the checkout line where Ronna Campos was working as a cashier.  According to plaintiff, she "barely knew" Campos.

When plaintiff and Curtis entered Campos's checkout line, APS Claybon went to the assets protection office and began viewing them and recording their transaction on a video monitor.  He also used a system called POSSI, which allows assets protection personnel to watch an image of the receipt of a transaction on a video monitor as the items are rung up by a cashier.  This allows assets protection workers to compare what they observe with the actual receipt of the transaction.  Not long after the transaction began, APS Claybon summoned Garcia to the assets protection office.

 The videotape and the receipts reveal the following in the Campos/Curtis transaction: Curtis was first in line and had her merchandise rung by Campos.
 Campos overrode the system and hand-keyed three binders for $2.56, $1.24, and $1.24, and made no attempt to scan the binders; Campos hand-keyed the price of a shirt for $1.52, even though Target prices do not end in the number "2," and did not attempt to scan the shirt; Campos charged different amounts for two identical pink fleece pants, and then passed a third pair into Curtis's bag without scanning or keying in the price; Campos picked up a small, unidentifiable item without scanning it and handed it to Curtis, who placed it in her shopping bag; and Campos keyed a sweatshirt for $10.40, voided the transaction, and then placed the sweatshirt into Curtis's bag without charging her for it.

After Campos concluded the Curtis transaction, she began to ring the plaintiff's items.  The first items on the conveyor belt were six binders of different designs and styles.  Before the binders were rung, Curtis, plaintiff and Campos had a discussion while indicating toward the tag on one of the binders.  Plaintiff then pointed to the register while saying something to Campos, and Campos hand-keyed the price of one binder at $1.24, hit the "quantity" key on the register, and charged plaintiff $1.24 for eight additional binders.  Campos engaged in this behavior despite the fact that the binders had tags with item numbers visible that, according to Target policy, should have been individually scanned.  Moreover, some binders were black with velcro closures, some had the word "Bulls" in red letters down the spine, and some were blue, leading to the conclusion that the items would have had different item numbers even if they were the same price.  Plaintiff notes that during her transaction with Campos, Donna Anderson and Keena Williams, the leader on duty, were present and approved the price charged for the binders.  However, neither Anderson nor Williams was present when the binders were rung.

As Garcia continued observing the plaintiff's transaction, APS Claybon allegedly went onto the sales floor to determine the retail price of the binders at issue and reported to Garcia that the binder he checked had a retail price of $13.99.  After plaintiff paid $30.75 for her items, she and Curtis went to leave the store through the employee exit, and an alarm sounded.  Allegedly, Claybon checked the plaintiff's receipt and bag, found that she had six binders and was charged for nine, and told her to get three more binders.  After finding no additional binders, she was told by Donna Anderson, the cashier supervisor, that she should get a refund.  She then went back to where Claybon was standing, talked briefly with him, and then entered the refund line.  While waiting in line, she had a conversation with Garcia, who had approached her and stated that he wanted to talk with her immediately.  She got off line without obtaining a refund and went with Garcia to an office.

Following the transaction, Garcia also requested that Campos and Curtis come into the assets protection office for questioning.  According to Target policy, one other Target employee sat in as a witness during each interview and prepared a written report of the interviews.  Campos was interviewed in the presence of employee witness Ruth Walker.  When asked about the undercharge for the binders, Campos informed Garcia that plaintiff "gave her the price of the binders."  

After plaintiff entered the office assigned to her, Garcia and an employee witness, Sherrice Ifelowo, entered.  Garcia told the plaintiff that she had merchandise in her bag for which she had not paid the correct price.  Plaintiff stated that she "selected several [binders] herself.  Ask [
sic
] about the price, she [plaintiff] replied that it was discounted below stickered price.  That is what she told the cashier.  So cashier rang it up below marked price."  

Based on the videotape, the receipts, and the interviews, Garcia and Claybon decided to call the Evanston police.  After reviewing the videotape and the documents, the police officers spoke to the plaintiff, Curtis, and Campos, placed them under arrest, and took them to the police station.  That evening, Garcia was called to the police station to sign criminal complaints prepared by the police against all three individuals.  As a result of the arrest, plaintiff felt "horrible."  Approximately two or three days after he signed the complaints, Garcia contacted the Evanston police department and inquired whether a court date had been assigned.  The sergeant who answered Garcia's call allegedly stated that no court date had been assigned to the case.

During the last week of January 1998, the Evanston Target's APTL, Brad Fiala, was promoted to a field analyst position outside of the Evanston store.  Approximately at the same time, Robert Lawson was transferred to the APTL position at the Evanston store and Barb Silnes became the DAPTL.  Not long after, on February 20, 1998, Garcia's and Claybon's employment with Target ended.

A few weeks after he began working at the Evanston store, Lawson received a subpoena for either Garcia or Claybon to appear in court on the criminal proceedings pending against plaintiff, Curtis, and Campos.  After receiving the subpoena, Lawson and Silnes reviewed all three case files, and Silnes conducted a separate investigation to confirm the actual price of the binders.  According to Silnes, she ran the two department class and item number codes on Curtis's and plaintiffs' receipts through Target's computer and found that the binders had retail values of $16.99 and $20.99, and had never been on clearance.  Silnes also testified that she knew that binders priced between that binders priced between $13.99 and $20.99 would not be marked down to $1.24, as once an item is marked down to 90% of its retail price, Target sends it to a salvage company.

Based on their review of the information available to them, Lawson and Silnes concluded that plaintiff knowingly received under-rung merchandise.  Specifically, Silnes testified that "everything combined gives me a clear picture of what happened. * * * It was [that] these people were stealing."  Accordingly, Lawson and Silnes claim that they attempted to contact Garcia and Claybon to appear in court on the matter.  Lawson and Silnes were unable to reach Claybon, but Lawson claimed that he spoke with Garcia.  Lawson asserted that Garcia was "on the fence" about whether he would appear for the court date.  Garcia, however, testified that no one ever told him about the court dates for the criminal case and that, if he had been told of the dates, he "definitely" would have been there.

In defendants' brief on appeal, they state that Lawson went to court for Target on the first day of trial, March 6, 1998, and then again on April 9, 1998.  In fact, Target claims that when Lawson appeared with a videotape and corresponding documents ready to testify on April 9, the assistant State's Attorney advised him that he would not be permitted to testify because he was not present in the Evanston store on the day of the incident.  The court then continued the matter until May 13.  However, in Target's answer to plaintiff's interrogatories, it states that Lawson only went to court on May 13, 1998.  Target now asserts that date is incorrect.  

Lawson stated that after appearing in court on April 9, 1998, he told the assistant State's Attorney that because both Claybon and Garcia no longer worked for Target, Target had no one available to testify who witnessed the theft firsthand.  On May 13, 1998, Silnes also spoke to the assistant State's Attorney and informed her that Target had the videotape of the incident and supporting documentation, but that she could not compel Garcia to testify.  Lawson testified in his deposition that, later that day, he told the assistant State's Attorney that Target wanted to have the case dismissed, upon instructions from Silnes.  Accordingly, the State struck the case from the docket with leave to reinstate (motion to SOL).   

On January 4, 1999, plaintiff brought this action against the defendants alleging two counts of false arrest and two counts of malicious prosecution.  During deliberations and prior to the verdict, the jury asked the trial court whether it could be permitted to read a statement into the record.  After a consultation and agreement between the parties, the court gave the jury permission to read its statement.  In the end, on December 4, 2001, the jury found in favor of  Target and Garcia on the false arrest claims and against Target and Garcia for the malicious prosecution claims.  However, the verdict form did not distinguish between the defendants or between malicious commencement and malicious continuation of prosecution.  As such, the jury was unable to distinguish between Garcia and Target in recording its verdict for the malicious prosecution claim.

Nevertheless, immediately after the verdict form was read and prior to the jury being discharged, the jury foreman read a unanimously signed statement into the record that found Garcia "not guilty" of malicious prosecution.  Plaintiff's attorney then prepared an order, stating that "the jury finding in favor of plaintiff Johnson as to counts III and IV malicious prosecution only, awards plaintiff $75,000 in compensatory damages."  At the conclusion of the sentence, a caret was added with the words "against both defendants."

After being granted an extension of time in which to file a posttrial motion, on February 4, 2002, Target timely moved for judgment notwithstanding the verdict, for a new trial, and for remittitur seeking a reduction in damages.  Garcia states that he did not join in Target's posttrial motion because "the jury had exonerated him of all liability."  On April 4, 2002, the trial court denied Target's motion.  On April 15, 2002, Target and Garcia filed a motion requesting the trial court to enter a 
nunc pro tunc
 order correcting the December 4, 2001, order by dismissing Garcia as a defendant.  Specifically, the motion sought to correct two clerical errors: first, it sought to correct the reference in the order to count III, because count III was a malicious prosecution claim brought by another plaintiff who was dismissed from the action on summary judgment; second, the motion stated that the order's reference to the damages being awarded against "both defendants" did not reflect the jury's verdict.  On May 6, 2002, the trial court denied Target and Garcia's motion.  

 Also on May 6, 2002, Target appealed from the judgment entered on the jury verdict of December 4, 2001, and the court's order of April 4, 2002, denying the motion for judgment notwithstanding the verdict, for a new trial, or for a remittitur. Target also appealed the court's May 6, 2002, order, which denied defendants' motion requesting the court to enter a 
nunc pro tunc
 order dismissing Garcia as a defendant.  

On May 6, 2002, in a separate notice of appeal, Garcia "join[ed] in the appeal of the judgment entered on the jury verdict of December 4, 2001, and the court's order of April 4, 2002, denying Target's motion for judgment notwithstanding the verdict of December 4, 2001, for a new trial or for a remittitur," as well as the court's order of May 6, 2002.  Garcia, alone, also appealed from the "judgment entered on the jury verdict of December 4, 2991, and the court's order of April 4, 2002, denying Target's motion for judgment notwithstanding the verdict of December 4, 2001, for a new trial or for a remittitur."  On June 5, 2002, this court granted defendants' motion to consolidate the appeals. 

On May 22, 2002, plaintiff filed a motion with this court to
 dismiss Garcia as an appellant for lack of jurisdiction, and this court took the motion with the case.  As plaintiff notes, Supreme Court Rule 303(a)(1) provides that a notice of appeal must be filed "within 30 days after the entry of the final judgment appealed from, or, if a timely post-trial motion directed against the judgment is filed, * * * within 30 days after the entry of the order disposing of the last pending post-judgment motion." 155 Ill. 2d R. 303(a)(1).  Section 2-1202 of the Code of Civil Procedure, which governs the timing of posttrial motions, also requires that such motions be filed within 30 days of the entry of judgment.  735 ILCS 5/2-1202 (West 2000).  In this case, therefore, plaintiff asserts that the last date for Garcia to file a posttrial motion or, failing that, notice of appeal, was on January 3, 2002.  

In addition, plaintiff notes, "the fact that one party files a timely posttrial motion does not excuse another party's obligation to file its posttrial motion within the statutory 30-day period after entry of judgment.  
Burnidge Corp. v. Stelford
, 309 Ill. App. 3d 576, 579, 723 N.E.2d 394 (2000)."  
Kim v. Alvey, Inc.
, 322 Ill. App. 3d 657, 665-66 (2001).  Accordingly, the fact that Target, alone, filed a motion for extension of time to file a posttrial motion on December 12, 2001, and then, alone, filed a motion for judgment notwithstanding the verdict, for a new trial, or for remittitur on February 4, 2002, does not extend the time to appeal to Garcia.  And since Garcia filed his joint posttrial motion on April 15, 2002, and his joint notice of appeal on May 6, 2002, plaintiff concludes that this court has no jurisdiction over 
any
 appeal as to him and that he must be dismissed as an appellant.  

With respect to Target, plaintiff argues that the April 15, 2002, motion was a successive posttrial motion and, therefore, is impermissible because it was filed more that 30 days after the judgment or any extension of time allowed for the filing of the postjudgment motion.  See 
Sears v. Sears
, 85 Ill. 2d 253, 259 (1981); 
In re Marriage of Stone
, 158 Ill. App. 3d 708, 713 (1987).  

Defendants' respond that Garcia timely appealed from the trial court's denial of his joint motion for a 
nunc pro tunc
 order.  As defendants relate: 

"
[N]otwithstanding the general rule that the circuit court retains jurisdiction only for 30 days after entry of a final order, a court may modify its judgment 
nunc pro tunc
 at any time.  
Beck
[
 v. Stepp
], 144 Ill. 2d [232,] 238, 579 N.E.2d [824,] 827 [(1991)].  
Nunc pro tunc
 orders are employed by courts to correct clerical errors in written orders and thereby make final orders entered in a case conform to the actual judgment of the court.  
Beck
, 144 Ill. 2d at 238, 579 N.E.2d at 827 (a court may enter a 
nunc pro tunc
 order ‛to correct a clerical error or matter of form so that the record conforms to the judgment actually rendered by the court';  the purpose of such an order ‛is to correct the record of judgment, not to alter the actual judgment of the court'); 
Gegenhuber
[
 v. Hystopolis Production, Inc.
], 277 Ill. App. 3d [429,] 432, 660 N.E.2d [107,] 110 [(1995)]."  
In re Marriage of Breslow
, 306 Ill. App. 3d 41, 50 (1999).

In the present case, therefore, where defendants were seeking an order to correct the reference to damages being awarded against "both defendants" as not being reflective of the jury's verdict, and the order's reference to count III –a count brought by an erstwhile plaintiff– the defendants assert that their April 15, 2002, motion sought a 
nunc pro tunc
 order.  And because the time for appealing the trial court's denial of their motion to correct ran from the date the trial court denied their motion (
People ex rel. Byrnes v. Standard
, 9 Ill. 2d 372, 375 (1956)), Garcia's appeal, which was filed the same day the trial court denied the motion to correct, was timely.  

With respect to Target, defendants argue that the April 15, 2002, motion raised a supplementary issue invoking the continuing power of the trial court to control its own process and, therefore, was not a posttrial motion.  See 
Couch v. State Farm Insurance Co.
, 279 Ill. App. 3d 1050, 1055 (1996), citing 
Klier v. Siegel
, 200 Ill. App. 3d 121, 125 (1990) (held that a request for a setoff does not need to be raised in a timely posttrial motion where it does not challenge the final judgment itself).  In such circumstances, defendants argue, the trial court retains jurisdiction to modify the judgment more than 30 days after it becomes final.  
Klier
, 200 Ill. App. 3d at 125-26.

Defendants also claim that this court has jurisdiction over Garcia's appeal from the judgment entered on the verdict because his appeal was timely filed under Supreme Court Rule 303(a)(3) (155 Ill. 2d R. 303(a)(3)).  Rule 303(a)(3) provides:

"If a timely notice of appeal is filed and served by a party, any other party, within 10 days after service upon him or her, or within 30 days from the entry of the judgment or order being appealed, or within 30 days of the entry of the order disposing of the last pending post-judgment motion, whichever is later, may join in the appeal, appeal separately, or cross-appeal by filing a notice of appeal, indicating which type of appeal is being taken."  155 Ill. 2d R. 303(a)(3).

Under this section, defendants assert that Garcia had 10 days from the date of Target's timely notice of appeal to file an appeal from the jury's verdict.  Accordingly, where Garcia joined in Target's appeal and filed a separate appeal on the same day Target filed its appeal, Garcia's appeal from the jury's verdict was also timely.

Since it is undisputed that the trial court had jurisdiction at all times to hear defendants' motion to correct and because the time for the appeal of the trial court's order denying that motion, as dictated by the supreme court rules, ran from the time of entry of the court's
 order, we find that Garcia's appeal from the court's disposition of the motion to correct – which was filed the same day the trial court denied the motion to correct – was timely.  See 
Breslow
, 306 Ill. App. 3d at 51 (and cases cited therein).  Accordingly, we have jurisdiction over Garcia with respect to his challenge of the trial court's refusal to enter a 
nunc pro tunc
 order.  

In addition, as Garcia notes, 
Supreme Court Rule 303(a)(3) allows him to join an appeal where "a timely notice of appeal is filed and served by * * * any other party, within 10 days after service upon him."  155 Ill. 2d R. 303(a)(3).  Where the trial court ruled on Target's timely motion for judgment notwithstanding the verdict, for a new trial, or for remittitur on April 4, 2002, and Target filed its notice of appeal on May 6, 2002, Target's appeal fell within the 30-day period mandated by Supreme Court Rule 303(a)(1) and, thus, was timely.  155 Ill. 2d R. 303(a)(1).  See 
In re Estate of Malloy
, 96 Ill. App. 3d 1020, 1025 (1981) (held that under the rule requiring the filing of a notice of appeal within 30 days of entry of final judgment, a notice of appeal was timely where the filing occurred 32 days after court's written order and the two days immediately preceding filing were a Sunday and a holiday).  Because Garcia joined in both that appeal and appealed separately on the same day Target appealed the jury's verdict –  May 6 , 2002, we find that both Garcia's joint and separate appeals from the trial court's April 4, 2002, order were timely and, therefore, we have jurisdiction over them as well.  Plaintiff's citation to section 2-1202 of the Code of Civil Procedure is inapposite, as it only governs the timing of posttrial motions to preserve issues for appellate review.  For these reasons, we deny plaintiff's motion to dismiss.

We must then decide whether the trial court erred in refusing to grant a 
nunc pro tunc
 order dismissing Garcia, which is reviewable 
de novo
.  
Gounaris v. City of Chicago
, 321 Ill. App. 3d 487, 493 (2001).  Plaintiff suggests that, where the judgment signed by the court reflected what the jury verdict form held, to change the verdict would be to newly construe the judgment using 
ex post facto
 reasoning.  As noted in 
Breslow
, a case cited by defendants, 
nunc pro tunc
 orders can only be utilized by courts to correct clerical error so that the record conforms to the court's judgment; not to alter the court's judgment.  
Breslow
, 306 Ill. App. 3d at 50.  Accordingly, where the jury's verdict and judgment was that Garcia was liable, defendants' attempt to change that to a "not guilty" is not an issue of clerical error, but one of reasoning and determination.  And because a clerical error cannot involve reasoning and determination (
First Bank of Oak Park v. Rezek
, 179 Ill. App. 3d 956, 959 (1989)), it was impossible that a 
nunc pro tunc
 could afford the relief that defendants sought.

That said, we note that while the jury was instructed that it could find against Target and not against Garcia for plaintiff's malicious prosecution claim, it was not provided a means to render such a verdict because the verdict form did not distinguish between the defendants for plaintiff's claims.  In other words, the jury was unable to discern between Garcia and Target in entering its verdict for the malicious prosecution claim.  Furthermore, the trial court instructed the jury that it was not to write or mark upon the verdict form. 

Prior to returning its verdict, however, the jury asked the court whether it would be permitted to read a statement into the record.  Counsel from both sides had no objections, and defense counsel telephoned the court reporter to ensure that the statement would be part of the record.  Accordingly, immediately after the verdict form was read and the prior to the jury being discharged, the following statement was read before the court:

"Mr. Garcia, in lieu of the fact that we found you not guilty of malicious prosecution by our interpretation of the law given to us – the intent of the jury is that you will more responsibly fill out your paperwork/reports and do more thorough investigative work and be responsible for appearing in court."

In light of the fact that this statement was given unanimously, defendants argue that there is no doubt as to the jury's intention in rendering its verdict – namely, that Garcia is not liable for malicious prosecution.  Accordingly, the trial court should have granted their motion for entry of 
nunc pro tunc
 order to have its final order conform to the jury's actual judgment.

According to
 the venerable 
Griffin v. Larned
, 111 Ill. 432 (1884), both the form and the substance of the verdict are within the control of the jury until its discharge, and the jury may vary or correct that verdict before such discharge.  In the present case, therefore, we think that the jury did the only thing it could do under the restrictions placed upon it: it changed the form of the verdict through a substantive reading of its findings and conclusions.  

While plaintiff is correct that defendants may have waived the issue of whether the verdict form was error for failing to raise it in a timely post-trial motion (735 ILCS 5/2-1202(c) (West 2002)), "the waiver rule is a limitation on the parties and not the jurisdiction of this court."  
AIDA v. Time Warner Entertainment Co., L.P.
, 332 Ill. App. 3d 154, 159 (2002).  Accordingly, if we so chose, we could decide the issue of whether the verdict form was in error.  However, that issue is irrelevant to whether the trial court's judgment conformed with the jury's verdict, as the court's December 4, 2001, order was constrained not by the verbiage of the verdict form, but by the jury's intent.

As the dissent correctly notes, it is impermissible to challenge a jury's verdict following the jury's discharge by explaining the basis for the jury's findings (
Chalmers v. City of Chicago
, 88 Ill. 2d 532, 537 (1982)).  " ‛Hence, no statements by the jurors, either unanimously or individually can be resorted to for explaining or changing its meaning or legal effect.'  (8 Wigmore, Evidence sec. 2356, at 723 (rev. ed. 1961).)" (Emphasis omitted.)  
Chalmers
, 88 Ill. 2d at 539-40.  However, as defendants point out, correcting an error in a verdict to make the true verdict apparent is not impeachment of the verdict.  See 
Loucks v. Pierce
, 341 Ill. App. 253, 257 (1950); 
Schwamb Lumber Co. v. Schaar
, 94 Ill. App. 544, 551, 553 (1901), quoting 
Dalrymple v. Williams
, 63 N.Y. 361, 364 (1875) (the court ordered a new trial upon unanimous affidavits from all jurors that they signed the wrong verdict form as a result of a mistake as to the parties, where doing so was " ‛not an attempt to reverse their action in the jury room, but to establish it' ").  As 
Gounaris
 noted:

" ‛[A] 
nunc pro tunc
 order may not be used to supply omitted judicial action, to cure a jurisdictional defect, or to correct judicial errors that are the result of deliberate but erroneous judicial reasoning.  [Citations.]  Moreover, "[
n
]
unc pro tunc
 orders must be based upon definite and precise evidence in the record.  [Citation.]  The certainty of evidence must be assured without reliance upon the memory of the judge or any other person[.  Further,] a 
nunc pro tunc
 order cannot be based upon 
ex parte
 affidavits or testimony."  [Citation.]  This evidence must clearly show "that the order being modified failed to conform to the decree actually rendered by the [agency]." ' [Citations.]" 
Gounaris
, 321 Ill. App. 3d at 493.

In the present case, after a careful review of the record, we find that the jury's statement that was read into the record indicating that Garcia was not liable for malicious prosecution is sufficiently "definite and precise evidence" to support a conclusion that the trial court should have entered a 
nunc pro tunc
 order making its judgment conform to the jury's verdict.  The unanimous statement, signed by every member of the jury and read into the record with both the parties' and the court's assent, better represents the jury's true disposition of the cause before it than the commonplace " ' "note, memorandum or memorial paper remaining in the files or upon the records of the court" ' that our supreme court has already found to be sufficient to support a 
nunc pro tunc
 order.  
Beck v. Stepp
, 144 Ill. 2d 232, 238 (1991), quoting 
Fox v. Department of Revenue
, 34 Ill. 2d 358, 360 (1966)."  
Gounaris
, 321 Ill. App. 3d at 493.
(footnote: 1)  Accordingly, we reverse the trial court's May 6, 2002 order denying defendants' motion for entry of a 
nunc pro tunc
 order, and dismiss Garcia from this case.  Quite simply, it is clear that the jury intended to exonerate him of all liability.

Despite the dissent's suggestion that our holding today "overrules 
Chalmers
, or at least stands that decision on its head" (slip op. at 44), we note that the dissent would also reverse the trial court's entry of judgment against Garcia, but then remand for a new trial.  In likewise finding that the jury's statement was inconsistent with its written verdict, the dissent castigates the trial court's failure to "straighten out the patent inconsistencies or vacte the verdict and grant a new trial" (slip op. at 43-44).  While we agree that the failure to clarify the judgment and verdict in this case has led to unecessary confusion, we think that to vacate the verdict and grant a new trial would be to ignore the jury's exclusive control over both the form and the 
substance
 of its verdict, as well as the precept that the jury may vary or correct its verdict before discharge.
  See 
Griffin v. Larned
, 111 Ill. 432 (1884)
.  
Because that is exactly what happened here – 
the jury corrected its verdict before discharge – we find no reason
 
to remand the case so that the jury can reiterate what it once already held.  The unanimously signed statement
 served only to establish the jury's true verdict and did not reverse the determination it made in the jury room.  Therefore, not only is the entry of a 
nunc pro tunc
 order not proscribed
 
by anything in 
Chalmers
 or its progeny, it is actually the preferred course of action.

Target's
(footnote: 2) first argument is that the trial court erred in denying its motion for 
judgment notwithstanding the verdict
 or for a new trial.  However, the principal relief it seeks throughout its appellate brief is the reversal of the jury's verdict against Target.  For that reason and because we find the judgment 
n.o.v.
 issue to be dispositive, we need not address the additional arguments defendant raises on appeal.  
We recently summarized the law on this issue:

"A judgment notwithstanding the verdict should not be granted unless the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favored the movant that no contrary verdict could possibly stand.  [Citation.]  A judgment notwithstanding the verdict is inappropriate in situations where ' "reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." '  [Citations.]  The trial court should not reweigh the evidence and set aside a verdict just because the jury could have drawn different conclusions or inferences from the evidence or because the court feels that another result would have been far more reasonable.  [Citations.]  Similarly, the appellate court should not usurp the jury's role on questions of fact that were fairly submitted, tried, and determined from the evidence which did not overwhelmingly favor either position. [Citations.]  We apply a 
de novo
 standard to determinations on motions for judgments notwithstanding the verdict. [Citations.]"  
Kamp v. Preis
, 332 Ill. App. 3d 1115, 1120 (2002).

To state a claim for malicious prosecution, a plaintiff must prove five elements: "(1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant;  (2) the termination of the proceeding in favor of the plaintiff;  (3) the absence of probable cause for such proceeding;  (4) the presence of malice on the part of defendant; and (5) damages resulting to the plaintiff.  
Turner v. City of Chicago
, 91 Ill. App. 3d 931, 934 (1980)."  (Emphasis omitted.)  
Illinois Nurses Ass'n v. Board of Trustees of the University of Illinois
, 318 Ill. App. 3d 519, 533-34 (2000).  In the present case, 
Target
 argues that judgment notwithstanding the verdict should have been granted for three reasons: (1) there was probable cause to continue the prosecution against the plaintiff; (2) there was no evidence of malice; and (3) the jury's verdicts are inconsistent.

With regard to probable cause, this court has commented:

"Probable cause has been defined in a malicious prosecution case involving criminal proceedings as a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged.  
Knox County v. Midland Coal Co.
, 265 Ill. App. 3d 782, 787, 640 N.E.2d 4 (1994); 
Burghardt v. Remiyac
, 207 Ill. App. 3d 402, 405, 565 N.E.2d 1049 (1991).  It is the state of mind of the one commencing the prosecution, and not the actual facts of the case or the guilt or innocence of the accused, that is at issue.  
Burghardt
, 207 Ill. App. 3d at 405-06; 
Robinson v. Econ-O-Corporation, Inc.
, 62 Ill. App. 3d 958, 960, 379 N.E.2d 923 (1978)."  
Rodgers v. Peoples Gas, Light & Coke Co.
, 315 Ill. App. 3d 340, 348 (2000).

Moreover, a mistake or error that is not grossly negligent will not affect the question of probable cause in an action for malicious prosecution when there is an honest belief by the complainant that the accused is probably guilty of the offense.  
Turner
, 91 Ill. App. 3d at 935.

"A reasonable ground for belief of the guilt of an accused may be on information from other persons as well as on personal knowledge.  (
Harpham v. Whitney
 (1875), 77 Ill. 32, 40; 
Mangus v. Cock Robin Ice Cream Co.
, [52 Ill. App. 3d 110,] 117 [(1977)].  It is not necessary to verify the correctness of each item of information so obtained; it is sufficient to act with reasonable prudence and caution in so proceeding.  
Mangus v. Cock Robin Ice Cream Co.
, [52 Ill. App. 3d] at 117; 
Gardiner v. Mays
 (1887), 24 Ill. App. 286, 289."  
Turner
, 91 Ill. App. 3d at 935.

 Finally, the failure to prove a lack of probable cause is fatal to a claim for malicious prosecution:

"The want of probable cause for instituting proceedings is the basis for a malicious prosecution action ([citations]) and it has been held an indispensable element of the cause of action (
Freides v. Sani-Mode Manufacturing Co.
  (1965), 33 Ill. 2d 291, 295, 211 N.E.2d 286; 
Mangus v. Cock Robin Ice Cream Co.
, [52 Ill. App. 3d] at 116)  If it appears that there was probable cause to institute the proceedings, such fact alone constitutes an absolute bar to an action for malicious prosecution. 
Mangus v. Cock Robin Ice Cream Co.
, [52 Ill. App. 3d] at 116; 
Brown v. Tucker
  (1918), 214 Ill. App. 162."  
Turner
, 91 Ill. App. 3d at 934-35.

 In the present case, Target first argues that it had probable cause to arrest the plaintiff.  For this, Target points to the fact that the jury found in favor of it and Garcia on plaintiff's false arrest claims.  To sustain an action for false arrest, plaintiff must prove restraint or arrest caused or procured by the defendant, without his having reasonable grounds to believe that an offense was committed by the plaintiff.  
Meerbrey v. Marshall Field & Co.
, 139 Ill. 2d 455, 474 (1990) (and cases cited therein).  Accordingly, Target argues that in finding against the plaintiff on her false arrest claim, the jury necessarily found that Target and Garcia had reasonable grounds to believe that an offense was committed by the plaintiff.  And where probable cause in the criminal setting is defined as "a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged" (
Rodgers
, 315 Ill. App. 3d at 348), Target argues that it and Garcia had, at least, the probable cause to arrest the plaintiff.

Next, Target argues that probable cause existed for the commencement of plaintiff's prosecution as well.  Under jury instruction No. 10, to which both parties agreed, the jury was advised that:

"The defendants are sued as principal and agent with respect to plaintiff's false arrest claim and plaintiff's malicious prosecution claim based upon the commencement of the prosecution.  Defendant Target is the principal and defendant Garcia is its agent.  If you find that defendant Garcia is liable for false arrest or maliciously commencing the prosecution, then you must find that defendant Target is also liable.  However, if you find that defendant Garcia is not liable for false arrest or maliciously commencing the prosecution, then you must find that defendant Target is not liable.

* * *

As to plaintiff's malicious prosecution claim based on continuation of the prosecution against plaintiff, only Target, not Garcia, may be held liable."

As defendants note and we have held, the jury found Garcia not liable for maliciously commencing the prosecution, as is evident in its statement, "we found you not guilty of malicious prosecution."  According to the jury instruction, therefore, Target was also not liable for the commencement of the prosecution, and the jury's verdict against Target can be based only upon the 
continuation
 of prosecution.  Put another way, because the jury necessarily found that neither Target nor Garcia was liable for the events that occurred on January 16, 1998 (the night of plaintiff's arrest), where plaintiff was arrested and the prosecution of her was commenced with Garcia's signing of the criminal complaint, Target's liability can be based only upon the 
continuation
 of prosecution; namely, the three court dates that occurred between March and April of 1998.

Defendant's last argument on this issue is that Target also had probable cause to 
continue
 the prosecution.  To that end, Target notes that Lawson and Silnes were the only Target representatives involved in continuing the proceedings against the plaintiff after January 16, 1998.  Consequently, the main inquiry is whether Lawson and Silnes had probable cause to continue the prosecution of the plaintiff.  As noted in the facts of this case, Lawson and Silnes' determination to proceed with the case against all three employees was based upon their review of the videotape and the witness statements on file, and their checking the price of the items in question.  

A review of the videotape  reveals that Campos passed several items to Curtis without charging her for them, while hand-keying several other items.  After Curtis's transaction, plaintiff then made a hand gesture to Campos (which Lawson and Silnes believed was "knowledgeable or causing the under-ringing") and Campos then charged plaintiff $1.24 each for 6 binders that normally cost anywhere from $13.99 to $20.99.  This corroborated Campos's statement that plaintiff "gave her the price of the binders" and plaintiff's statement that she "selected several [binders] herself.  Ask[ed] about the price, she replied that it was discounted below sticker price.  That is what she told the cashier.  So [the] cashier rang it up below marked price."

The videotape also reveals what Silnes determined to be Campos hand-keying some of plaintiff's other items and undercharging her for two shirts, as well as plaintiff presenting untagged items for purchase in further violation of Target policy.  This is bolstered by the documentation provided by Claybon and Silnes's independent review of the prices of the merchandise.  As previously stated, binders originally priced between $13.99 and $20.99 would not have been offered for a clearance price less than 90% of their retail price.  And, as plaintiff admitted, she refused to prepare a statement of her version of events, so it appears there was very little reason for Lawson and Silnes to doubt the veracity of the witness statements or their observations on the videotape.

In reply, plaintiff offers no explanation as to how Target's reasonable belief that an offense was committed by the plaintiff dissipated between the time she was arrested and when Garcia, acting on behalf of Target, signed the criminal complaint against her.  As such, we find that Target –as principal of Garcia– was not liable for the malicious commencement of prosecution and, consequently, that the jury only could have found it liable for the malicious continuation of prosecution.  

In 
that
 regard, plaintiff offers a 3 1/2 page list of factual inconsistencies that, she argues, supports the verdict by demonstrating Target's lack of probable cause to continue the prosecution.  For example, plaintiff notes: Garcia and Claybon failed to tell anyone that one of plaintiff's binders was purportedly on clearance; there was a missing videotape of the transaction; there were inconsistencies regarding the frequency of conversations Garcia had with his APTL, Brad Fiala; there were timing and price inconsistencies between Target's incident report and the criminal complaint; Silnes was unable to verify the price of all the binders purchased that evening; Donna Anderson, the cashier supervisor, and Keena Williams, the leader on duty, were present on the videotape during plaintiff's transaction; Silnes did not view the videotape until November 25, 1998; Target allegedly failed to communicate the court dates to Garcia; and Silnes and Lawson were aware that plaintiff attempted to get a refund for three binders for which she was charged $1.24 and did not receive.

None of those allegations, however, suggest anything so substantial as to make Target's belief that plaintiff committed a crime unreasonable and to remove the probable cause necessary to continue the prosecution of the plaintiff, especially in light of the fact that they are not supported by any references to the record.  Accordingly, as Target notes, those assertions are either irrelevant to Lawson's and Silnes's state of mind or they simply address the plaintiff's arrest and not her prosecution.  

For example:  the fact that neither Garcia nor Claybon told anyone that one of plaintiff's binders was allegedly on clearance does nothing to the reasonableness of Silnes's or Lawson's impression, where there was no evidence that either Lawson or Silnes knew of Garcia's and Claybon's knowledge; there is no evidence of what existed on the allegedly missing tape, or that Lawson or Silnes was aware of what was on the tape; the actual number of times Garcia and Fiala spoke could not possibly operate to exculpate plaintiff in the minds of Lawson and Silnes, where such information appears to be irrelevant; the timing and monetary discrepancies between the arrest report and Target's incident report do not exonerate the plaintiff from purchasing under-rung binders at $1.24 each, where Silnes was able to verify the prices of those binders on defendant's receipt; neither Donna Anderson nor Keena Williams was present when the binders at issue were rung up, and there is no evidence that either Anderson or Williams authorized the price that Campos charged plaintiff for the binders; even assuming that Silnes did not view the videotape until November 25, 1998 (after the criminal case against the plaintiff had been stricken off the call), the failure to view that tape would not impact the issue of whether probable cause existed where Silnes also investigated the correct prices of the binders, read witness statements, and reviewed the other evidence in this case; even if the jury believed Garcia's testimony that Target did not give him the proper court dates, such a fact would be irrelevant to Lawson's and Silnes' belief that plaintiff committed theft
(footnote: 3); and finally, the fact that plaintiff was trying to obtain a refund for the three binders she did not receive does not appear to establish a lack of probable cause where she was attempting to get a refund without returning anything, thereby causing monetary loss to Target.

The evidence, even viewed in the light most favorable to the plaintiff, establishes the high probability that plaintiff purchased binders at a price unreasonably lower than their actual retail price.  Accordingly, based on that evidence, it also appears that Target –through Lawson and Silnes– at least had a reasonable belief that plaintiff participated in this illegal under-ringing.  And because plaintiff has presented very little evidence, substantiated by the record, that refutes that reasonable belief, we hold that Target's motion for judgment 
n.o.v.
 should have been granted.  Quite simply, the jury's verdict, based on this evidence, cannot stand.

However, even were we to assume that no probable cause existed to continue the prosecution against the plaintiff, she must still prove the existence of malice on the behalf of Target or its agents to perfect her claim of malicious prosecution.  "Malice is defined as ‛[t]he intent, without justification or excuse, to commit a wrongful act.'   Black's Law Dictionary 968 (7th ed. 1999)."  
Illinois Nurses Ass'n
, 318 Ill. App. 3d at 534.  The jury was instructed that "in order to find malice, you must find that the proceedings were commenced or continued with the purpose of injuring [plaintiff] or for some other purpose than to establish a commission of a criminal offense by [plaintiff]."  It is undisputed that Lawson and Silnes never met plaintiff prior to the time that the criminal proceedings were pending, and there was no evidence presented that suggested that Lawson or Silnes bore plaintiff ill will or was acting for any other reason than to establish that plaintiff committed theft.  This much is evident from the fact that Target proceeded against all three former employees in the same manner and did not single out the plaintiff.

As Target notes, the only evidence plaintiff presented that could possibly support an argument for the existence of malice has to do with Garcia, not Lawson or Silnes.  As previously stated, plaintiff testified that she was engaged to a man named Victor, and Victor had a stepmother named Alice who did not like Victor dating the plaintiff.  Because they are friends, Alice told Garcia her feelings, and Garcia told the plaintiff that she and Victor should not be together.  This, we think, does not support a finding that Lawson and Silnes acted with malice in continuing the prosecution of the plaintiff.

Moreover, this is not a situation in which malice may be inferred.  Malice may be inferred from a lack of probable cause only where there is no other credible evidence which refutes that inference.  
Salmen v. Kamberos
, 206 Ill. App. 3d 686, 691 (1990).  In the present case, there is sufficient evidence that both Lawson and Silnes acted with a good-faith belief that plaintiff had engaged in theft.  Accordingly, even if we were to assume that evidence does not rise to the level of probable cause to continue the prosecution of the plaintiff, it still refutes the inference of malice.  See 
Harpham v. Whitney
, 77 Ill. 32, 38-39 (1875) ("[I]f the defendant can not justify by proof of probable cause, he may still rebut the presumption of malice by showing facts and circumstances calculated to produce at the time, on the mind of a prudent and reasonable man, a well-grounded belief or suspicion of the party's guilt.  [1 Hilliard on Torts,] 515").  And because plaintiff failed to present any other evidence that Target – through Lawson and Silnes – acted with malice in continuing the prosecution, we again find that the trial court erred in failing to enter judgment 
n.o.v.
 for Target based on 
plaintiff
's failure to prove that element of her cause.

Alternatively, Target also asserts that the jury's verdicts in this case are irreconcilably inconsistent and, therefore, should be set aside as a matter of law.  See 
Wottowa Insurance Agency, Inc. v. Bock
, 104 Ill. 2d 311, 316 (1984).  In this case, Target argues, because the jury found the equivalent of probable cause to reject plaintiff's claim of false arrest, but found Target lacked probable cause to continue the prosecution, the verdicts are inconsistent.  Target argues that, although no Illinois court has ruled on this precise issue, decisions from other jurisdictions have held that probable cause to arrest will defeat a malicious prosecution claim unless the plaintiff demonstrates that additional facts came to light after the arrest that would negate probable cause.  "It is well settled that in the absence of an Illinois determination on a point of law, the courts of this state will look to other jurisdictions as persuasive authority.  
Cooper v. Hinrichs
, 10 Ill. 2d 269 (1957)." 
Hawthorne v. Village of Olympia Fields
, 328 Ill. App. 3d 301, 316 (2002).  See 
Campanaro v. City of Rome
, 999 F. Supp. 277, 281 (N.D.N.Y. 1998), 
Dukes v. City of New York
, 879 F. Supp. 335 (S.D.N.Y. 1995); 
Callan v. State of New York
, 73 N.Y.2d 731, 532 N.E.2d 96, 535 N.Y.S.2d 590,
 (1988); 
Oakley v. City of Rochester
, 71 A.D.2d 15
 421, N.Y.S.2d 472 (1979), 
affirmed
, 51 N.Y.2d 908, 415 N.E.2d 966 (1980); 
Feinberg v. Saks & Co.
, 83 A.D.2d 952, 
443 N.Y.S.2d 26 (1981); 
Brown v. City of New York
, 92 A.D.2d 15
, 459 N.Y.S.2d 589 (1983), 
affirmed
, 60 N.Y.2d 893, 458 N.E.2d 1248 (1983).

In 
Feinberg
, for example, the court quoted its general rule that "a defendant who has ‛probable cause' to subject a plaintiff to a ‛reasonable detention' has a complete defense to a cause of action for false arrest or imprisonment and that the existence of such ‛probable cause' will serve to bar an action for malicious prosecution as well [citation]."  
Feinberg
, 83 A.D.2d at 953,
 443 N.Y.S.2d at 27.  The court then added, "[o]f course, should some intervening fact become known to defendant between the time of detention and the time of prosecution which would serve to exonerate the plaintiff, any further prosecution at that point would be wanting of probable cause. Under such circumstances, an action for malicious prosecution would lie even though the plaintiff was not falsely imprisoned or detained [citation]."  
Feinberg
,  83 A.D.2d at 953,
 443 N.Y.S.2d at 27.  Ultimately, the 
Feinberg
 court found that because no intervening circumstances occurred that "would vitiate appellants' probable cause to detain and subsequently prosecute the plaintiff" (
Feinberg
, 83 A.D.2d at 953, 443 N.Y.S.2d at 27
), the jury, having found probable cause to detain plaintiff, was obliged to find that appellants also had probable cause to prosecute  (
Feinberg
, 83 A.D.2d at 953,
 443 N.Y.S.2d at 28).

Likewise, in 
Brown
, the court found that "since probable cause for the arrest was established as a matter of law and the jury found for defendants on the false arrest charge, plaintiff could recover [for malicious prosecution] only if he could prove that probable cause to prosecute him was dissipated between the time of the arrest and his arraignment, a period of less than 24 hours, and was no longer existent at that time *** [citation]."  
Brown
, 92 A.D.2d at 17,
 459 N.Y.S.2d at 591.  In the end, the court held that "[w]ithout such proof, the presumption of probable cause afforded by the arraignment and the jury's finding of probable cause for the arrest precluded a verdict for plaintiff for malicious prosecution as a matter of law.  The verdict should have been set aside as irrational, and the complaint dismissed as a matter of law."  
Brown
, 92 A.D.2d at 20,
 459 N.Y.S.2d at 592.

The plaintiff responds by noting that false arrest does not necessarily require that an individual has been arrested by the police (
Lopez v. Winchell's Donut House
, 126 Ill. App. 3d 46 (1984)), and that it may be effected by words alone (
Marcus v. Liebman
, 59 Ill. App. 3d 337, 339 (1978)).  Here, therefore, plaintiff suggests that "[t]he jury could have found that plaintiff went willingly into the back room and/or that the initial detention and even arrest was reasonable given the circumstances. *** The jury obviously determined that there was some reason for the detention but that at some point Target should have caused the criminal proceedings to end."  Accordingly, because it is possible that the jury found that Garcia never detained the plaintiff against her will –instead of finding that he had reasonable grounds to detain her– the verdicts are not necessarily inconsistent.  Put another way, because it is entirely possible that the jury never even entertained the issue of whether Garcia had reasonable grounds to detain the plaintiff, it does not necessarily follow that the verdicts were inconsistent. 

In her appellate brief and oral arguments, plaintiff would have this court believe that the issue of her willingness to accompany Garcia to the interview room was, at least, before the jury and that the jury found evidence to suggest that she voluntarily consented to Garcia's request.  Paragraphs 10 and 11 of her amended complaint, however, demonstrate that her focus was not upon the voluntariness of her restraint, but the grounds upon which Garcia and Target relied to effectuate that restraint:

"10.  Neither defendant had probable cause or reasonable belief that either plaintiff had committed any criminal offense.

11.  As a direct result of, and based upon the signed criminal complaints of Garcia, the police 

arrested each of the plaintiffs and took them into custody, deprived them of their liberty."

Accordingly, because the plaintiff offered no testimonial version of the events and because no other evidence exists to support the contention that the plaintiff willingly went with Garcia to the interview room, we find it impossible that the jury could have even considered, much less decided, that plaintiff could not perfect her false arrest claim on that ground.

Moreover, while we agree that false arrest may be effectuated by either "an arrest" or through "restraint," the key to either scenario is that the alleged offender acted without *** having reasonable grounds to believe that an offense was committed by the plaintiff.  See 
Meerbrey
, 139 Ill. 2d at 474.  As noted, probable cause in the criminal setting is defined as "a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged" (
Rodgers
, 315 Ill. App. 3d at 348).  As plaintiff cannot suggest anything to distinguish those two standards (
i.e.
, that "reasonable grounds" to believe an offense has been committed is a weaker standard than an "honest and strong suspicion" that an offense has been committed), we think that they are, for all purposes, equal.

Because of that equality, therefore, it stands to reason that our sister courts in New York are correct that, barring any intervening events, a finding that a defendant had reasonable grounds to arrest a plaintiff is also sufficient to satisfy the probable cause requirement for instituting criminal proceedings against the plaintiff.  Accordingly, in such circumstances, that finding of the equivalent of "probable cause" should serve to bar an action for malicious prosecution.  In the present case, neither the plaintiff nor the record offers any example of an intervening cause that would invalidate Target's reasonable grounds to detain/arrest and then prosecute the plaintiff.  Without any intervening cause, the jury's finding of reasonable grounds for plaintiff's arrest necessarily forecloses a verdict for plaintiff for malicious prosecution as a matter of law.  Therefore, we also find for Target on the alternative ground that the trial court erred in failing to enter judgment 
n.o.v.
 for Target based on the inconsistency of the jury's verdicts.

Because our decision as to this issue is dispositive, we need not address any of Target's remaining arguments.  Accordingly, we reject plaintiff's motion to dismiss Garcia's claims for a lack of jurisdiction.  In addition, we hold that the trial court erred in failing to grant the defendants' motion for a 
nunc pro tunc
 order dismissing Garcia as a party.  Finally, we find that the trial court erred in refusing to grant Target judgment 
n.o.v.
 because Target had probable cause to continue its prosecution of the plaintiff, the plaintiff provided no evidence of malice, and the jury's verdicts are inconsistent. 

Reversed.

KARNEZIS, J., concurs.

HARTMAN, J., dissents.

Justice Hartman dissents:

Our supreme court has often explicated the relative functions and authorities of juries, trial courts and appellate courts.  Among the most frequently cited and followed opinions on this subject is the venerable case of 
Maple v. Gustafson
, 151 Ill. 2d 445, 603 N.E.2d 508 (1992) (
Maple
), in which the court made clear:

"An initial step in analyzing the issue before us is to determine the authority of the jury, trial court, and appellate court, and their relationship to one another.  Unquestionably, it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony.  [Citation] A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable. [Citations.] 
Likewise, the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way
."  (Emphasis added.)  
Maple
, 151 Ill. 2d at 452-53.

As great as the temptation may be to emulate factfinders in our review, this court must avoid usurping such 
nisi
 
prius
 functions, as settled law directs.  As will be seen later, the jury was confused with respect to its role as factfinder, for which the appropriate remedy should be reversal and new trial rather than a judgment as to the facts by this court and a strained application of law to those facts to the detriment of law and justice.

In the majority opinion, the approach to the instant jury trial obliterates appropriate boundaries and the majority sets itself up as factfinder and, having made its findings, proceeds to review them.  Recountal of the evidence presented to the jury during the trial of this case from a different prespective reveals the following, and demonstrates why reversal and a new trial would be appropriate.  

Plaintiff, Melissa Johnson, supervisor and food avenue team leader for Target was an African-American female, 29 years old and the mother of two boys.  She had never been disciplined by Target prior to the date of the incident, January 16, 1998.  Prior to January 16, 1998, Ruben Garcia, a senior asset protection employee, who signed the original criminal complaint against Johnson on behalf of Target, had discussed with Johnson his disapproval of her dating and being engaged to a Mexican employee of Target.  Garcia was close to the Mexican employee's family.  On January 16, 1998, Johnson planned to get a ride home from another team leader, Gwen Curtis, when her shift ended, so she waited.  She and Curtis did some shopping, shared the same shopping cart, selected various items, including binders, and then went to a specific register designated for employee purchases.  

The evidence reveals that more than one video was trained on the checkout registers.   One videotape of the checkout purportedly showed Donna Anderson, a cashier supervisor, standing behind Ronna Campos, the cashier at the employee's register, during the subject transaction.  She later was seen talking with Campos at a different location.  The video also purportedly showed Keena Williams, the store leader on duty, keying in one of the items at the register.

Johnson purchased the binders for the use of her two sons, ages nine and six.  The Target employee at the binder display location had told her that the binders were on clearance, which meant the best possible price.  Johnson did not know the regular or sale price of the binders.  She also bought some items of boys' clothing.  She paid the cashier $30.75 for her items and, with Curtis, went to the employee exit.  

The store alarm sounded.  Corey Claybon, another asset protection employee, asked to see the contents of her bag, then examined the receipt, noted that she had six binders, but she was charged for nine, and told her to get three more binders.  She could not find more binders and went to Donna Anderson, the cashier supervisor, who told her to get a refund.  She went back to where Claybon was, and then to the refund line where Ruben Garcia said he wanted to talk to her immediately.  She got out of the line without any refund and went with Garcia to an office.  When Garcia told her that she had merchandise in her bag that had not been paid for, she asked him to look at the receipt and tell her what had not been paid for.  They later discussed whether the binders were underrung, of which she denied any knowledge.  Evanston police entered, placed her in handcuffs and escorted her to a squadrol.  When she left, Target retained the merchandise that she had purchased, as well as the money she paid for that merchandise.

Brad Fiala, the assets protection team leader at the Evanston store on January 16, 1998, was not present during the occurrence, but investigated what occurred and made a report for his superiors.  Fiala's report showed that $155.79 was the full retail value of the items involved and stated that no merchandise was recovered that evening.  According to Fiala's report, Johnson received "passed"
(footnote: 1) merchandise, although Target later admitted Johnson received no passed merchandise.  Target allowed Johnson to return three of the binders that she bought that night, and was ready to refund her $1.24 for each.  There is a service desk video purportedly showing Johnson returning three binders.  In contradiction, the report also stated that $155.79 was recovered.  Fiala reviewed the report for accuracy before he sent it to his supervisor.  The merchandise paid for by Johnson had been returned to the selling floor for Target to sell again.  Parenthetically, it is significant that the jury made a separate award to Johnson of $30.75 for the items paid for but confiscated by Target.  

Fiala admitted that Garcia was authorized to sign criminal complaints in his absence and Garcia signed the criminal complaint against Johnson on behalf of Target.  In the complaint, Garcia swore that Johnson had received goods valued at $99.44 for $9.44.  Fiala did not know what items comprised those numbers.  No one from Target knew what the numbers on the criminal complaint referred to.   Fiala admitted that Johnson was either overcharged for three binders or the number she received was wrong.  Fiala stated that she went through the line with nine, and she returned three, leaving six, but all Target reports alleged that she stole nine.  Johnson most likely returned those three binders before she was placed in the interview room.  Fiala did not understand why a "thief" was allowed to return some, but not all, of the "stolen" goods.  He did not remember what Garcia said about this; it is not in any report. 

Ruben Garcia testified that he signed all three criminal complaints at the police station.  He swore to the correctness of the allegations, and swore that he was a security manager, although Target admitted that Garcia was not the security manager at that time.  Garcia read the criminal complaints before signing them.  Garcia had been called to the security room and met with Corey Claybon who was watching Johnson and Curtis check out at Campos' register.  He did not speak to the cashier supervisor that night.  He did see some other employee come to the register during the transaction.  Garcia admitted that if hypothetically the cashier supervisor told the cashier that the binders were $1.24, then only the cashier and cashier supervisor would be at fault.  There were two different video machines taping the transaction, from two different angles.  After Garcia talked with Fiala the first time, Claybon went to determine the price of the binders and came back and told him it was $13.99.

Garcia admitted that in his deposition he testified Johnson and Curtis each "had one binder  that was on clearance that was clearly priced clearance."  Garcia also admitted that at his deposition he testified that he knew those binders were marked clearly as on clearance because earlier that day he looked at the binders, which his children might use, and wanted to purchase them at that price.  He had taken them in his hands and was aware of which were on clearance, because they exhibited a red sticker tag.  Garcia also testified that in his deposition he stated that one of Johnson's binders clearly was marked as clearance.  Johnson continually denied doing anything wrong.  

When he next spoke with Fiala, Garcia did not report that Johnson and Curtis each had a binder with a clearance sticker on it.  No report or document stated that at least one binder for each woman was on clearance.  At trial, Garcia reversed himself and testified that he did not see the clearance sticker on any binder, although Garcia admitted he thought he had testified previously that he had actually seen the clearance sticker.  He did not tell the police that some binders were on clearance. 

Garcia was never asked about the second videotape by Fiala or other Target officials.  Target was unable to produce the second tape at trial, though they were the last entity that possessed it.  (The circuit court gave the jury Illinois Pattern Jury Instruction, Civil, No. 5.01 as to the missing tape.)  Garcia testified that the taping was done on two video monitors.  He stopped the taping of one so that he could review what had been taped.  One tape goes from beginning to end, and the one from the opposite side was the one that he stopped to review. 

Garcia testified that he swore to the truth of the criminal complaint against Johnson, but that he had no idea of what the $99.44 with which she was charged with stealing represented.  Garcia knew that Johnson did not get nine binders and that if the reports say she did they are wrong.  Garcia thought the $99.44 was for five or six binders, for which she paid $9.44.  The receipt, which shows Johnson buying nine binders at $1.24, for a total of $11.16, also is wrong.  Garcia did not know where the $9.44 came from, although he swore that that number was true and correct on the criminal complaint.  He believed Johnson was charged for nine binders but got only five or six.  He never told that to anyone.  Garcia testified the case activity notes portion of the incident report stated that $70.60 was the total discount, but that he did not know how that was calculated.  Another report listed the discounted items as being $70.42, and Garcia also signed that paper, but he did not know where that number came from.  In another report, which he signed, Garcia admitted that Johnson did not tell the cashier that the binders were $1.24 specifically, or any specific price.  

According to Garcia, the video shows Campos on the phone during the checkout transaction, but Garcia did not ask her about that.  The video shows a woman, not the cashier Campos, hand-keying in the price for certain items, but Garcia did not speak to that woman, and did not know who she was.  Garcia testified that the video showed the cashier turning on her light which could have been a call for assistance from her supervisor.  The missing video would show which light was on.  Garcia admitted that the report stated that the primary reason for Johnson's arrest was passing merchandise, but that Johnson did not pass any merchandise or receive any passed merchandise.  Garcia wrote no report that he had heard Johnson tell the cashier what price to charge for the binders, although he was trained to document important observations.

The majority asserts that although the jury's verdict was read, signed by each juror, and each juror was polled and affirmed that the verdict signed by each of them was their verdict, nevertheless a statement thereafter handed to the judge somehow vitiated the signed verdict and, in contradiction to the verdict specifically finding Ruben Garcia and Target guilty as to malicious prosecution, the statement must prevail as better representing the jurors' true disposition of the cause before it.

The report of proceedings reflects the following with respect to the event in question:

"THE COURT: I have been handed forms of verdict purporting to bear the signature of all twelve jurors.

"The first of which reads as follows: 
We the jury find in favor of the plaintiff, Melissa Johnson and against the defendants, Ruben Garcia and Target as to Count I and II, false arrest, no.  Count III and IV, malicious prosecution, yes.
  (Emphasis added.)

"We award the plaintiff in compensatory damages against 
the defendants
 as follows: For pain and suffering experienced, $75,000."  (Emphasis added.)

The court then began its polling process, as follows:

"Beginning with you, Ms. Bloch, was that your verdict at the time that you signed it and is it your verdict now?

"JUROR BLOCH: It was and, yes, it is.

THE COURT: Ms. Reed?

JUROR REED: Yes.

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: Yes.

UNIDENTIFIED JUROR: Yes.

"THE COURT: All jurors having answered in the affirmative, I read next the verdict form, A-1: We the jury find that punitive damages should be awarded as follows: Against Ruben Garcia, no.  Against defendant, Target, yes.

"For Ruben Garcia, punitive damages in the sum of zero against Target, $125,030.75, to be written as two checks one, $125 and one $30.75.

"And, again, this purports to bear the signature of all twelve jurors.  Again, starting with you Ms. Bloch, was that your verdict as to punitive damages at the time that you signed this verdict form and is it your verdict now?

"JUROR BLOCH: Yes, it was and yes, it is.

"THE COURT: Again, all twelve jurors having answered in the affirmative."

After having polled the jury as noted above, the circuit court then remarked:

"Counsel is directed to prepare a judgment order consistent with the jury's verdict and the purpose directed to enter judgment on the verdict."

After directing counsel to draft an order reflecting the jury's verdict, the court stated:

"I don't think I want to read this.  I prefer that you do this.  I have been handed a statement of some kind bearing the signatures of the jurors, and I'll allow the foreperson to read that if she wishes.

"JUROR BLOCH: Mr. Garcia, in lieu of the fact that we found you not guilty of malicious prosecution by our interpretation of the law given to us, the intent the jury gives to be more responsibly fill out your paperwork or to do more thorough investigative work and be responsible for appearing in court."

After the statement was read into the record, no motion to clarify the record or to question the jurors, or to correct the record, or to amend the record, or to enter any kind of objection was made by Garcia or Target.  

The court then observed:

"THE COURT: Ms. Bloch, ladies and gentlemen of the jury, I want to thank you for your service.  You did, in fact, pay careful attention throughout the trial.  I know that counsel and the court appreciate the service you provided. *** 

"I discharge you, and at this time you are free to discuss this case with anybody that you may choose to speak with, including the attorneys.

***

"If there's any questions that I can answer that I'm permitted to within the ethical boundaries that prescribe my conduct, then I will be glad to try to talk to you about those as well.  And if I can't, I'll let your know that.  Okay?  Again, my heartfelt thanks.  I appreciate it."

No record objection was made nor any questions asked by any of the parties, their counsel or any jurors following these remarks.   To reach the conclusion that the jury's extra-verdict statement controls here, the majority cites only a partial excerpt from 
Chalmers v. City of Chicago
, 88 Ill. 2d 532, 539-40, 431 N.E.2d 361 (1982) (
Chalmers
).  In consideration of the unique procedure authorized by the majority decision and in fairness to the development of the law, the balance of the 
Chalmers
 opinion as it applies to this issue must be set forth.

"It is apparent to us that under the facts before us 
plaintiff seeks to impeach the verdict not because of a 'clerical' mistake in recordation but because of the jury's misapprehension of the instructions or the effect of their findings.  This type of impeachment is clearly impermissible.

"The authorities are in accord that the testimony or affidavits of jurors cannot be used to show that the jury misunderstood the instructions or the law
 (see 8 Wigmore, Evidence sec. 2349 (rev. ed. 1961) and cases cited therein), 
the effect of a particular finding or of their verdict
 (see 66 C.J.S. 
New Trial
 sec. 169(n) (1950); 76 Am. Jur. 2d 
Trial
 sec. 1220 (1975)).  
The meaning and effect of the verdict must be judged from its terms alone.  'Hence, no statements by the jurors, either unanimously or individually can be resorted to for explaining or changing its meaning or legal effect.
'  (8 Wigmore, Evidence sec. 2356, at 723 (rev. ed. 1961).)  As Dean Wigmore explains:

'This must be so by virtue of the general principle that a legal act is to be construed by the words used in it and not by the private meaning or intention of the person uttering them. [Citation.]  To resort to the jurors' motives, beliefs or intentions would be to violate the general principle *** [8 Wigmore, Evidence sec. 2349 (rev. ed. 1961) 
[that] the verdict as uttered is the sole embodiment of the jury's act and must stand as such without regard to the motives or beliefs which have led up to its act
 [8 Wigmore, Evidence sec. 2349 (rev. ed. 1961)].'  

"*** 
If there was an error, it should have been discovered prior to the jury's discharge, at which point the trial judge could have taken such action as might have been appropriate.  Plaintiff had a right to poll the jurors.  She cannot now substitute the affidavits of the jurors following her ex parte communication with them for the purpose of impeaching their verdict.

"In view of the inconsistency between the jury's special finding and the general verdict, the trial court correctly disallowed the award for punitive damages.  (See Ill. Rev. Stat. 1977, ch. 110, par. 65; 
Albaugh v. Cooley
 (1981), 87 Ill. 2d 241.)  For the reasons stated the post-trial relief predicated upon the affidavits of the jurors was correctly denied."  (Emphasis added.)  
Chalmers
, 88 Ill. 2d at 539-41.

Following 
Chalmers
, the appellate court in 
Couch v. State Farm Insurance Co.
, 279 Ill. App. 3d 1050, 666 N.E.2d 24 (1996) (
Couch
), observed:

"
It is well settled that the meaning and effect of a verdict must be judged from its terms alone
.  
Chalmers v. City of Chicago
, 88 Ill. 2d 532, 539, 431 N.E.2d 361, 365 (1982).  
Consequently, no statements by the jurors, either individually or unanimously, may be resorted to for explaining or changing the verdict's meaning or legal effect
.  
Chalmers
, 88 Ill. 2d at 539-40, 431 N.E.2d at 365; 
Sale v. Allstate Insurance Co.
, 126 Ill. App. 3d 905, 925, 467 N.E.2d 1023, 1036 (1984).  Only evidence that the jury considered extraneous information can be used to impeach a verdict.  See 
Macias v. Cincinnati Forte
, 277 Ill. App. 3d 947, 950, 661 N.E.2d 472, 474 (1996)."  (Emphasis added.)  
Couch
, 279 Ill. App. 3d at 1056-57.

And, in 
Sale v. Allstate Insurance Co.
, 126 Ill. App. 3d 905, 467 N.E.2d  1023 (1984) (
Sale
), the appellate court noted: 

"Testimony or affidavits of jurors cannot be used to show that the jury misunderstood the instructions or the law, the effect of a particular finding, or of their verdict.  The meaning and effect of the verdict must be judged from its terms alone.  
Hence, no statements by the jurors, either unanimously or individually, can be resorted to for explaining or changing its meaning or legal effect.
  (
Chalmers v. City of Chicago
 (1982), 88 Ill. 2d 532, 539-40, 431 N.E.2d 361, 365.)  We hold that the trial court properly denied plaintiff's motion for a new trial predicated upon the affidavit of the juror."  (Emphasis added.)  
Sale
, 126 Ill. App. 3d at 925.

It cannot be said that the circuit court properly should have entered a 
nunc
 
pro
 
tunc
 order in the case 
sub
 
judice
 exonerating Garcia under these circumstances, as the majority rules.  Instead, the court should have endeavored to clarify the jury's verdict and findings then and there, when the note was handed to the court and read by the juror into the record.  Clearly, the jury was confused; its statement was inconsistent with its verdict.  Under 
Chalmers
, the court was obligated to take appropriate ameliorative action by questioning the jurors while they were still in court before him and straighten out the patent inconsistencies or vacate the verdict and grant a new trial.  As set forth above, there is ample evidence upon which an action for malicious prosecution can proceed.

To now hold, as the majority would do, that the jury statement prevails over its verdict, as verified by its poll, overrules 
Chalmers
, or at least stands that decision on its head.  I would follow 
Chalmers
 and its progeny, reverse and remand for a new trial.  To grant judgment for Garcia and Target as a matter of law miscarries the rule of law and rewards their indolence in failing to take remedial action until almost four months after the jury had been discharged and dispersed.

For the reasons stated above, I would reverse and remand for a new trial.

FOOTNOTES
1:  Ironically, in rebuttal, plaintiff also points to two ancillary documents that allegedly show that the court's December 4, 2001, order was correct.  The first, a note from the jury asking the judge whether it could specify a particular amount of punitive damages against the defendant
s
, was never read into the record, signed by the jurors, or shown to counsel. Because it is not known at which stage in the deliberations that note was created, it would be impossible to deduce from it that the jurors intended to impose monetary damages against both Garcia and Target, especially in light of the fact that no punitive damages were awarded against Garcia.  The second, an "error correction form," shows that the clerk of the circuit court originally entered the verdict without awarding plaintiff any monetary damages.  Because this says nothing about which parties against whom the verdict was entered, we also disregard it.

2: 
 While defendants filed joint and separate appeals contesting Target's liability, Garcia is dismissed from this case for the reasons stated above.  Accordingly, as Target is the only remaining defendant, what once would have been referred to properly as "defendants'" arguments will now be referred to as "Target's."

3:  Moreover, plaintiff's assertion that Target never contacted Claybon is without merit, where Lawson testified that he left telephone messages with Claybon about the date.

1:
Unpaid for.